## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DONALD E. SHERRY, derivatively on behalf of ROCKWELL MEDICAL, INC. | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER CLASS ACTION AND DERIVATIVE COMPLAINT** |
| v. | |
| ROBERT L. CHIOINI, PATRICK J. BAGLEY, RONALD D. BOYD, KENNETH L. HOLT, THOMAS KLEMA, AJAY GUPTA, AND RAYMOND D. PRATT, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants, | |
| and | |
| ROCKWELL MEDICAL, INC., | |
| Nominal Defendant. | |

Plaintiff Donald E. Sherry ("Plaintiff") alleges, upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys, except as to those allegations that pertain to the Plaintiff himself, which are alleged upon knowledge, as follows:

## <u>SUMMARY OF THE ACTION</u>

1.       Plaintiff asserts this action for breach of fiduciary duty derivatively on behalf of Rockwell Medical, Inc. ("Rockwell" or the "Company") against the

Company's Board of Directors (the "Board") and certain executive officers in connection with the wrongful compensation decisions made by the Board's Compensation Committee (the "Compensation Committee") during 2014. Plaintiff also asserts, on behalf of himself and the other public shareholders of Rockwell entitled to vote at the Company's 2014 Annual Meeting of Shareholders (the "2014 Annual Meeting"), a direct claim against the Board for breaching its fiduciary duties in connection with a false and misleading proxy statement disseminated by the Board

2.    In 2014, the Compensation Committee granted Robert L. Chioini ("Chioini"), Rockwell's founder, President, Chief Executive Officer ("CEO"), and Chairman, 750,000 stock options and 300,000 shares of restricted stock under the Company's shareholder-approved Amended and Restated 2007 Long Term Incentive Plan (the "Plan"). However, the Plan limits the number of stock options and shares of restricted stock that an individual employee can receive in a fiscal year to 500,000 and 200,000 shares, respectively (the "Limits"). Accordingly, in the 2014 fiscal year, the Compensation Committee granted Chioini 250,000 stock options and 100,000 shares of restricted stock in excess of what was permitted by the Plan. By approving these awards in violation of the terms of the Plan, the Compensation Committee exceeded its authority and breached their fiduciary duties to the Company and its shareholders.

2

3.      In addition, on October 1, 2014, the Compensation Committee granted an aggregate of 825,000 stock options to themselves and certain executives, including Chioini. These stock options were granted with an exercise price of $8.88 per share, which was equal to the closing price of Rockwell stock on the date of the grant. The Plan requires that stock options be granted at the market price of Rockwell's stock in order to ensure that recipients of stock option awards can earn a profit from the options only if they improve Rockwell's performance going forward. However, as described below, the Compensation Committee's apparent compliance with the Plan was illusory, as the Committee "spring-loaded" these stock options by making the grants at a time when they (and all Defendants) were in possession of material non-public information soon to be released that they expected to – and ultimately did – positively impact the Company's stock price.

4.      Specifically, the Compensation Committee granted these stock options just two days before Rockwell announced that it had entered into an exclusive distribution agreement with Baxter Healthcare Corporation ("Baxter"), pursuant to which Baxter would serve as the exclusive distributor of Rockwell's hemodialysis concentrate and ancillary products in the United States and selected foreign countries. Following this announcement, Rockwell's stock traded at more than 10 times its 30-day average trading volume before closing at $10.63 on October 3, 2014. Accordingly, rather than providing the stock option recipients

3

with an incentive to work hard and improve Rockwell's future performance, the October 1, 2014 stock options actually amounted to hidden bonuses to the recipients which gave them additional compensation for positive developments that had already occurred, but had not yet been announced publicly. The Compensation Committee granted, and Defendants accepted, these spring-loaded stock options with the intention of circumventing the shareholder-approved restriction on the exercise price in the Plan, thus breaching their fiduciary duty of loyalty.

5.    Additionally, on April 4, 2014, the Board filed a materially false and misleading Schedule 14A Proxy Statement (the "2014 Proxy") with the United States Securities and Exchange Commission ("SEC") in connection with the 2014 Annual Meeting of Shareholders. In the 2014 Proxy, the Board solicited shareholder approval of, among other things, the approval of amendments to the Plan doubling the annual Limits and increasing the aggregate amount from 7,750,000 to 9,500,000 of Rockwell common stock reserved for awards under the Plan.

6.    As a result of the above misconduct, the Company and its shareholders have been, and will be, harmed.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Plaintiff and Defendants are citizens of different states and the matter in

controversy exceeds $75,000.00, exclusive of interest and costs. Plaintiff is a citizen of Ohio and no Defendant is a citizen of Ohio.

8.      This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.      Venue is proper in this district because nominal defendant Rockwell is headquartered in this district.

## THE PARTIES

10.     Plaintiff Donald E. Sherry is and has been a shareholder of Rockwell since October 2011. Plaintiff is a citizen of Ohio.

11.     Nominal party Rockwell is a Michigan corporation with its principal place of business at 30142 Wixom Road, Wixom, Michigan, 48393. Rockwell is a fully-integrated biopharmaceutical company targeting end-stage renal disease and chronic kidney disease with products and services for the treatment of iron replacement, secondary hyperparathyroidism and hemodialysis. The Company is listed on the NASDAQ Exchange.

12.     Defendant Chioni has served as the Company's President and CEO since 1997, and has served as Chairman since 2000. Chioni is a citizen of Michigan.

13.     Defendant Patrick J. Bagley ("Bagley") has been a director since 2005, and served as a member of the Compensation Committee in 2014. Bagley is a citizen of Michigan.

14.     Defendant Ronald D. Boyd ("Boyd") has been a director since 2000, and served as the Chairman of the Compensation Committee in 2014. Boyd is a citizen of Georgia.

15.     Defendant Kenneth L. Holt ("Holt") has been a director since 2000, and served as a member of the Compensation Committee in 2014. Holt is a citizen of North Carolina.

16.     Defendant Thomas Klema ("Klema") has served as Company's Vice President, Chief Financial Officer ("CFO"), Treasurer and Secretary since 1999. Klema is a citizen of Michigan.

17.     Defendant Ajay Gupta ("Gupta") has served as Company's Chief Scientific Officer since 2009. Gupta is a citizen of California.

18.     Defendant Raymond D. Pratt M.D. ("Pratt") has served as Company's Chief Medical Officer since 2012. Pratt is a citizen of Michigan.

19.     Defendants Chioni, Bagley, Boyd, and Holt comprised the Company's Board at the time the awards challenged herein were granted and are referred to herein as the "Director Defendants."

## **FURTHER SUBSTANTIVE ALLEGATIONS**

### *Defendants Exceeded Their Authority Under the Plan*

20.     In 2007, the Board adopted and the Company's shareholders approved the Plan. Various amendments to the Plan have been approved over the years, including each year between 2008 and 2014. At the time the challenged awards were made, the Plan had been most recently approved on May 22, 2014, at the Company's 2014 Annual Meeting.

21.     The Plan provides the Compensation Committee with the authority to grant various equity awards to themselves, any other non-employee directors, executive officers, other employees, and consultants of the Company.

22.     The Plan, as approved in May 2014, provided that during any fiscal year no individual employee may be granted awards of stock options covering more than 500,000 shares or awards of restricted stock covering more than 200,000 shares. Specifically, Section 7.3 stated: "no Participant in any one fiscal year of the Corporation may be granted (a) Options or Stock Appreciation Rights with respect to more than five hundred thousand (500,000) shares of Common Stock; [and] (b) Restricted Stock or Restricted Stock Units that are denominated in shares of Common Stock with respect to more than two hundred thousand (200,000) shares[.]" Rockwell's 2014 fiscal year ended on December 31, 2014.

23.     When it sought shareholder approval of amendments to the Plan in the Company's Schedule 14A Proxy Statement filed with the SEC on April 13, 2015, the Board stated unequivocally: "the LTIP limits grants to any one participant in any one fiscal year to 500,000 options or stock appreciation rights, 200,000 restricted shares or restricted stock units[.]"

24.     On January 13, 2014, the Compensation Committee awarded Chioini 250,000 stock options and 100,000 shares of restricted stock under the Plan. Then, on October 1, 2014, the Compensation Committee awarded Chioini another 500,000 stock options and 200,000 shares of restricted stock under the Plan. In total, the Compensation Committee awarded Chioini 750,000 stock options and 300,000 shares of restricted stock under the Plan in the 2014 fiscal year, exceeding the Limits by 250,000 stock options and 100,000 shares of restricted stock.

25.     By granting these awards to Chioini in excess of the Limits, the Compensation Committee plainly exceeded its authority under the Plan and breached its fiduciary duties. The Compensation Committee had no authority or discretion to exceed the limitations set forth in the Plan as approved by shareholders.

26.     Consequently, the excess stock options and restricted stock to Chioini are *ultra vires* and should be rescinded.

*Defendants Gave Themselves "Spring-Loaded" Stock Options*

27.   On October 1, 2014, the Compensation Committee granted themselves and various executive officers an aggregate of 825,000 stock options under the Plan. The stock options had an exercise price of $8.88, the NASDAQ closing price of the Company's stock on the date of grant.

28.   However, the Compensation Committee granted these stock options at a time when they *knew* that Rockwell shares were actually worth much more than the exercise price. Specifically, the Compensation Committee knew that the Company would soon disclose the same facts known to the Committee at the time the options were granted and the stock price would likely increase accordingly.

29.   Just two days after the Compensation Committee granted valuable stock options to company insiders, Rockwell announced its valuable exclusive distribution agreement with Baxter. The press release stated, in part:

> WIXOM, MICHIGAN, October 3, 2014 — Rockwell Medical, Inc. (NASDAQ: RMTI), a fully-integrated biopharmaceutical company targeting end-stage renal disease (ESRD) and chronic kidney disease (CKD) with innovative products and services for the treatment of iron replacement, secondary hyperparathyroidism and hemodialysis, announced today that it has signed an exclusive agreement with Baxter Healthcare Corporation, a subsidiary of Baxter International Inc. (NYSE:BAX), to commercialize Rockwell's hemodialysis concentrate product line in the U.S. and in select overseas markets.
>
> Under the terms of the agreement, Baxter will become the exclusive distributor of Rockwell's hemodialysis concentrate and ancillary products in the U.S. and selected foreign countries for an initial term

of 10 years.  Baxter can extend the agreement for two additional 5-year terms upon meeting certain sales targets, coupled with a $7.5 million payment related to the first extension.  Baxter will purchase products from Rockwell at a pre-determined gross margin-based price per unit and is required to meet minimum annual purchase levels in order to retain their exclusive rights. Baxter will leverage Rockwell's unique distribution operations in order to provide specialized customer and delivery service for concentrates, covering Rockwell's costs for these services. Rockwell will retain sales, marketing and distribution rights for its hemodialysis concentrate products in certain foreign countries in which it has an established commercial presence.

In consideration for the exclusive commercialization rights, Baxter will pay Rockwell $20 million in cash. Baxter will also purchase $15 million of Rockwell common stock. The investment in Rockwell shares is being made at a price per share equal to the average closing price of RMTI shares over the last 12 months (or $11.39 per share).  Rockwell is eligible for milestone payments totaling $10 million related to the expansion of its manufacturing capabilities to serve customers across the U.S.

30.    Executive officers at both Rockwell and Baxter discussed the importance of their exclusive agreement. As stated in the press release:

"This long-term, strategic supply and distribution agreement enables Rockwell to expand and accelerate our hemodialysis concentrate business, while we continue to strategically build our drug pharma business in the U.S. and globally," stated Robert L. Chioini, Founder, Chairman and CEO of Rockwell.  "We are excited to be partnering with Baxter, a global market leader who has a proven track record in the field of dialysis and renal products.  This agreement benefits dialysis patients and service providers by expanding access to our market leading products in new territories, while reducing future risk."

Jill Schaaf, Corporate Vice President and President of Baxter's Renal business, added, "Baxter remains committed to addressing the needs of patients and healthcare providers with a comprehensive range of therapeutic options across home, in-center and hospital settings.  This

partnership enhances Baxter's product portfolio with the addition of Rockwell's high-quality hemodialysis concentrate products."

31.    In response to this news, Rockwell's stock traded at tremendous volume with 3,187,940 shares (more than 10 times the 30-day average trading volume of 295,283 shares) changing hands to close at $10.63 on October 3, 2014. As of the market's close on October 3, 2014, the October 1, 2014 awards were already "in the money" by $1.75 per share.

32.    On October 1, 2014, just two days prior to the Company's announcement of its exclusive distribution agreement with Baxter, the Compensation Committee granted stock options to themselves and other insiders, providing the recipients the right to purchase an aggregate of 825,000 shares of Rockwell common stock at an exercise price of $8.88. Specifically, the Compensation Committee granted the following options:

| Name | Position | Number of Options |
| --- | --- | --- |
| Chioni | Chairman, President & CEO | 500,000 |
| Klema | Vice President and CFO | 120,000 |
| Gupta | Chief Scientific Officer | 50,000 |
| Pratt | VP of Drug Development | 50,000 |
| Holt | Director | 35,000 |
| Boyd | Director | 35,000 |
| Bagley | Director | 35,000 |
| **Total** | | **825,000** |

33.    The timing of these grants is even more suspicious when viewed in the context of the Company's historical option grant practices. In each of the past

four years, the compensation of the Company's non-employee directors has consisted of an *annual* grant of stock options made in *January*. This continued in January 2014, with Boyd, Holt and Bagley granting themselves options to purchase 35,000 shares of Rockwell stock on January 13, 2014. However, unlike in previous years, Boyd, Holt and Bagley granted themselves a second round of stock options on October 1, 2014. Boyd's, Holt's, and Bagley's sudden decision to grant themselves a second round of stock options for 2014 is powerful evidence that their intent was to take advantage of the expected stock gains that would occur after the announcement of the deal with Baxter.

34.     Likewise, the Compensation Committee has historically granted equity awards to the Company's executive officers in either January or June. Accordingly, the timing of the October 1, 2014 stock options also does not align with the past grants made to the Company's executive officers.

35.     Moreover, the Board and the Company's executive officers chose not to disclose the unusually-timed stock option grant in any Form 8-K filing. In another departure from normal practice, the Company has disclosed stock awards made to its executive officers in Form 8-Ks filed with the SEC.

36.     The October 1, 2014 stock options were granted under the Plan. The Plan requires that the exercise price of stock options be set at no less than Rockwell's "Fair Market Value" on the date of the grant, which is defined in

Section 1.4(p) as "the closing price of the Common Stock on the Stock Exchange for the Grant Date" (the "FMV Requirement") Section 1.4(ff) of the Plan defines "Stock Exchange" to mean "the principal national securities exchange on which the Common Stock is listed for trading," which is the NASDAQ. This requirement is designed to ensure that the recipient of the stock options will only make a profit if the Company's market value increases following the date of the grant, thus incentivizing the recipient to work hard to improve the corporation's future performance, and aligning the recipient's interests with the Company's shareholders.

37.     As the Plan's purpose stated:

> The purpose of the Plan is to (a) promote the best interests of the Corporation and its shareholders by encouraging Employees, Non-Employee Directors and Consultants of the Corporation and its Subsidiaries to acquire an ownership interest in the Corporation by granting stock-based Awards, thus aligning their interests with those of shareholders, and (b) enhance the ability of the Corporation to attract, motivate and retain qualified Employees, Non-Employee Directors and Consultants.

38.     In addition, in the 2014 Proxy, the Board stated: "Non-qualified stock options have a ten year life with vesting in installments over a three year period and an exercise price equal to the fair market value of our common shares on the grant date. Structured in this way, the options have value only to the extent our stock price increases during the ten year term of the options."

13

39.    At the time of the October 1, 2014 stock option grant, the exclusive distribution agreement with Baxter announced a mere two days later was surely finalized or very near finalization. Indeed, Rockwell and Baxter officially entered into the agreement the very next day after the stock options were granted. Given the importance of the exclusive distribution agreement with Baxter, there is no doubt that Defendants were aware as of October 1, 2014 that the Company was on the verge of publicly announcing this deal. Accordingly, at the time of the October 1, 2014 stock option grant, each of Defendants possessed material non-public information soon to be released that they expected would positively impact Rockwell's stock price.

40.    Compensation Committee members Boyd, Holt and Bagley breached their fiduciary duty of loyalty by granting stock options to themselves and other insiders at a time when they understood those shares were actually worth more than the exercise price. It is inconsistent with the duty of loyalty for a board of directors to ask for shareholder approval of a stock option plan and then later distribute shares to themselves and other insiders in such a way as to undermine the very objectives approved by shareholders. Similarly, the Defendants breached their fiduciary duties by accepting stock options when they knew those shares were worth considerably more than the exercise price.

41.    Moreover, the Compensation Committee intended to circumvent the shareholder-approved restrictions on the exercise price when granting the stock options on October 1, 2014. As administrators of the Company's stock incentive plans, the Compensation Committee was required to be and was in fact aware of the FMV Requirement and its purpose. Accordingly, with the upcoming announcement of the exclusive distribution agreement with Baxter just two days away, the Compensation Committee deliberately deviated from its past practice of granting equity awards in January or June to grant themselves and other insiders "spring-loaded" stock options in October 2014. The suspicious timing, purpose, and size of the grants strongly indicate that these grants were made to take advantage of the upcoming announcement of the exclusive distribution agreement with Baxter before it was made public.

## Demand Was Wrongfully Refused

42.    Plaintiff brings this action derivatively on behalf of Rockwell to redress injuries sustained by the Company as a direct and proximate result of Defendants' misconduct.

43.    On January 8, 2015, Plaintiff (along with another Rockwell shareholder) made a written demand on the Board (the "Demand," attached as Exhibit A). Plaintiff demanded the Board: (a) rescind the 825,000 stock options granted to Defendants on October 1, 2014; (b) rescind the 250,000 stock options

15

and 100,000 shares of restricted stock granted to Chioini in excess of the Limits in 2014; (iii) investigate whether any additional violations of the Plan occurred; and (iv) institute meaningful corporate reforms designed to prohibit and prevent a recurrence of the Plan violations and ensure the Company's compliance with NASDAQ rules and regulations.

44.     On April 3, 2015, Rockwell's counsel, Lori McAllister ("McAllister") responded to the Demand, and reported that on February 23, 2015, Rockwell had filed an *ex parte* petition with the Oakland County Circuit Court in the State of Michigan to appoint S. Thomas Wienner ("Wienner") of Wienner & Gould P.C. to investigate the Demand. (Ms. McAllister's April 3, 2015 letter is attached hereto as Exhibit B.) The court granted the petition on March 6, 2015.

45.     Ms. McAllister further reported that at the conclusion of Mr. Wienner's investigation the Board elected to accept his recommendation not to pursue the claims in the Demand on behalf of the Company and its public shareholders. Ms. McAllister stated that Mr. Wienner concluded "that it would not be in the best interests of Rockwell Medical, Inc. for the Company to pursue directly any of the claims asserted in the Shareholder Demand or to permit the maintenance of a derivative action arising out of those claims." (Exhibit B at 2.)

46.     It is clear that the investigation was not performed in a good faith and reasonable manner, and did not properly or adequately respond to the concerns

expressed in the Demand. Thus, the Board's refusal of the Demand is unreasonable and in bad faith.

47.     As explained above, Section 7.3 of the Plan clearly and unambiguously provides that no individual employee may be granted awards of stock options covering more than 500,000 shares or awards of restricted stock covering more than 200,000 shares during any fiscal year. Yet despite this, the Compensation Committee awarded Chioini 750,000 stock options and 300,000 shares of restricted stock under the Plan in the 2014 fiscal year. Further, the Compensation Committee granted themselves and the other Defendants a total of 825,000 stock options under the Plan on October 1, 2014 despite being in possession of material non-public information that they intended to be released in the next two days and was sure to positively impact Rockwell's stock price. There is no plausible interpretation of the Plan that would permit the making of these awards consistent with Defendants' fiduciary duties.

48.     Because the Demand has been wrongfully refused, Plaintiff was left with no recourse other than to initiate this derivative action.

49.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting the Company's rights.

50.     Plaintiff is a shareholder of Rockwell stock as defined at MCL § 450.1491a(b) and owned Rockwell stock during all times relevant to Defendants' wrongful course of conduct alleged herein.

## Defendants Materially Misrepresented the Limits When Seeking Shareholder Approval of Plan Amendments in 2014

51.     In Proposal No. 3 of the 2014 Proxy, the Board sought approval of various amendments to the Plan, including increasing the Limits from 250,000 to 500,000 for stock options and/or stock appreciation rights, and from 100,000 to 200,000 for restricted shares. In the same proposal, the Board sought shareholder approval of an amendment to the Plan increasing the aggregate amount of Rockwell common stock reserved for issuance as awards under the Plan from 7,750,000 to 9,500,000.

52.     As discussed above, on January 8, 2015, Plaintiff made a written demand on the Board, which detailed the Plan violations discussed herein.

53.     On April 13, 2015, three months after receipt of the Demand, the Board filed a Schedule 14A Proxy Statement in connection with the Company's 2015 Annual Meeting of Shareholders (the "2015 Proxy").

54.     In the 2015 Proxy, the Board informed Rockwell shareholders that it had amended Section 7.3 of the Plan pertaining to the Limits.

55.     Specifically, as disclosed in the 2015 Proxy, the Board added the following language to the end of Section 7.3: "For the avoidance of doubt, the

18

limitations set forth in this Section 7.3 apply only to Awards intended by the Committee to satisfy the performance based compensation requirements of Code Section 162(m)" (the "2015 Amendment").

56.     By making this disclosure in the 2015 Proxy, the Board has admitted that the statements in the 2014 Proxy concerning the Plan were false and misleading.

57.     Section 162(m) of the Internal Revenue Code ("Section 162(m)") provides rules that must be followed before awards can qualify as "performance based compensation," and thus obtain favorable tax treatment for certain compensation paid to certain employees in excess of $1 million. These rules include the requirement that awards be issued pursuant to a shareholder-approved compensation plan that contains a limit on the amount of options or compensation that can be granted to a plan participant.

58.     The Limits satisfy this requirement. However, prior to 2015 Amendment and the 2015 Proxy, the Board represented that the Limits applied to every award issued under the Plan and not just awards intended to be tax-deductible. In other words, while the Limits satisfy the requirements of Section 162(m), the Board told shareholders that they applied to both tax-deductible and non-tax-deductible awards.

59.     Based on the 2015 Amendment and the 2015 Proxy, however, it

appears that the Board's previous representations were false. Rather, it appears that the Board believes that the Limits only need to be followed to the extent the Compensation Committee intends to make tax-deductible awards. In direct contradiction to what was disclosed in the 2014 Proxy, the Board now contends that the Plan allows the Compensation Committee to exceed the Limits if they do not "intend" to make an award tax-deductible.

60.    Given this position, this means that the 2014 Proxy was false and misleading because the Board represented that the Limits applied to every award issued under the Plan when they actually applied only to awards the Compensation Committee intended to be tax-deductible.

61.    As discussed, the Board sought approval of various amendments to the Plan in the 2014 Proxy, including increasing the Limits and the aggregate amount of Rockwell common stock reserved for issuance as awards under the Plan.

62.    In seeking shareholder approval of these amendments, the 2014 Proxy did not describe the Limits as merely discretionary limits that the Compensation Committee could disregard if the awards were not meant to be tax-deductible under Section 162(m).

> Subject to the adjustment provisions described above, the LTIP limits grants to any one participant in any one fiscal year to 250,000 options or stock appreciation rights (proposed to be increased to 500,000), 100,000 restricted shares or restricted stock units (proposed to be increased to 200,000), 100,000 performance awards and 100,000 annual incentive awards. The LTIP further limits the dollar value

payable to any one participant in any one fiscal year on restricted stock units, performance awards or annual incentive awards valued in property other than common shares to the lesser of $2 million or four times the participant's base salary (or if the participant is a director or consultant, the participant's total cash compensation) in the fiscal year. These limitations are intended to comply with requirements of Section 162(m) of the Code.

63. By comparison, in the 2015 Proxy (when the Board sought further amendments to the Plan), the Board added a new sentence to this paragraph, which stated:

Subject to the adjustment provisions described above, the LTIP limits grants to any one participant in any one fiscal year to 500,000 options or stock appreciation rights, 200,000 restricted shares or restricted stock units, 200,000 performance awards and 200,000 annual incentive awards. The LTIP further limits the dollar value payable to any one participant in any one fiscal year on restricted stock units, performance awards or annual incentive awards valued in property other than common shares to the lesser of $2 million or four times the participant's base salary (or if the participant is a director or consultant, the participant's total cash compensation) in the fiscal year. *These limitations are included for the sole purpose of qualifying the compensation for the exemption from the $1 million cap on deductibility under Section 162(m) of the Code and do not apply to the extent the Compensation Committee determines not to structure the grant to comply with the exemption.*

(emphasis added)

64. Likewise, in the 2014 Proxy, the Board stated that all stock options granted under the Plan would be tax-deductible under Section 162(m), *i.e.*, that stock options would be granted within the Limits. As stated in the 2014 Proxy:

Section 162(m) of the Internal Revenue Code of 1986, as amended, restricts the deductibility of executive compensation paid to our chief

21

executive officer and any of our four other most highly compensated executive officers at the end of any fiscal year to not more than $1 million in annual compensation (including gains from the exercise of certain stock option grants). Qualifying performance-based compensation, including gains from option exercises, is exempt from this limitation if it complies with the various conditions described in Section 162(m) and the accompanying regulations. ***The Amended and Restated 2007 Long Term Incentive Plan contains provisions intended to cause compensation realized in connection with the exercise of options granted thereunder to be exempt from the Section 162(m) restrictions.***

(emphasis added)

65.     In the 2015 Proxy, however, the very same paragraph was modified to state that the Compensation Committee had discretion to disregard the Limits and grant stock options that exceed them.

66.     In other words, in the 2014 Proxy, shareholders were led to believe that the Limits were hard caps, and that no participant could be granted more than 500,000 stock options and stock appreciation rights or 200,000 shares of restricted stock. In reality, however, the Compensation Committee held the position that it could exceed the Limits should it choose, but did not say so until after the Plan was approved and Defendants granted awards that did not comply with the Plan.

67.     The ability to grant any participant a virtually unlimited amount of equity awards under the Plan during a fiscal year (subject only to the Plan's aggregate limit) can lead to significant dilution very quickly and the rapid use of

the shares available under the Plan. Properly informed shareholders may think twice about approving such a plan.

68.     On May 22, 2014, the Company's shareholders voted to approve the amendments to the Plan, including an increase to annual Limits and the aggregate limit from 7,750,000 to 9,000,000 shares.

69.     Because of the Board's false and misleading description of the Plan's terms in the 2014 Proxy, the vote was not informed and was instead based on materially false information.

70.     Accordingly, the amendment approved at the 2014 Annual Meeting should be deemed invalid.

## CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the shareholders of Rockwell common stock (the "Class") entitled to vote at the 2014 Annual Meeting.  The Class specifically excludes defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the defendants.

72.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  According to the 2014 Proxy, there were 40,772,476 shares of Rockwell stock issued and outstanding as of April 1, 2014.  The actual number of

public shareholders of Rockwell can be ascertained through discovery but Plaintiff believes there are thousands of beneficial holders of the Company's stock;

b.      There are questions of law and fact which are common to the Class, including, *inter alia*, the following:

i.      Whether the Director Defendants breached their fiduciary duties with respect to Plaintiff and the other members of the Class; and

ii.      Whether the Director Defendants breached their fiduciary duties by filing the false and misleading 2014 Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the

24

interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

f. Director Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I
## Breach of Fiduciary Duty
## (Derivatively, Against All Defendants Except Rockwell)

73. Plaintiff realleges each allegation contained above as if fully set forth herein.

74. As officers and directors of the Company, each Defendant owes fiduciary duties to the Company and its shareholders.

75. As demonstrated by the allegations above, Defendants breached their fiduciary duties by approving and accepting stock awards in violation of the terms of the Plan.

76. Defendants Bagley, Boyd, and Holt breached their fiduciary duties by intentionally violating the Plan and exceeding the authority granted to them by the Company's shareholders by granting Chioni the excess stock grants described above.

77.     Defendant Chioni breached his fiduciary duty of loyalty by knowingly accepting stock awards in violation of the terms of the Plan, placing his own self-interest ahead of the interests of the Company and its shareholders.

78.     Defendants Bagley, Boyd, and Holt further breached their fiduciary duty of loyalty by granting stock options to themselves and other insiders at a market-value exercise price at a time when they knew those shares were actually worth more than the exercise price and with the intention of circumventing the shareholder-approved restrictions in the plans.

79.     The Defendants breached their fiduciary duties by accepting the "spring-loaded" October 1, 2014 stock options.

80.     As a result of Defendants' actions, the Company has been and will be damaged.

81.     Plaintiff and the Company have no adequate remedy at law.

## COUNT II
### Breach of Fiduciary Duties in Connection with the 2014 Proxy
### (Direct Claim Against Director Defendants)

82.     Plaintiff realleges each allegation contained above as if fully set forth herein.

83.     The fiduciary duties of the Director Defendants require them to be completely truthful with the Company's shareholders and disclose all material information.

84.     As set forth above, the Director Defendants have breached their fiduciary duty by filing and seeking shareholder action on the basis of the materially false and misleading 2014 Proxy.

85.     As a result, Plaintiffs and Class members have been harmed.

86.     Plaintiff and the Class have no adequate remedy at law.

## COUNT III
### Unjust Enrichment
### (Derivatively, Against All Defendants Except Rockwell)

87.     Plaintiff repeats each allegation set forth above as if fully set forth herein.

88.     Chioni received unauthorized personal financial benefits as a result of the stock award granted in violation of the Plan's annual limits.

89.     Defendants received unauthorized personal financial benefits as a result of the October 1, 2014 stock options that were granted at an exercise price that did not reflect the true fair market value of Rockwell's common stock on the date of grant.

90.     It would be unconscionable and against fundamental principles of justice, equity, and good conscience for Defendants to retain the benefits of awards granted in plain violation of the Plan.

91.     Defendants have been unjustly enriched at the expense and to the detriment of the Company.

27

92.     Plaintiff and the Company have no adequate remedy at law.

**COUNT IV**
**Waste of Corporate Assets**
**(Derivatively, Against Boyd, Holt and Bagley)**

93.     Plaintiff repeats each and every allegation set forth above as if fully set forth herein.

94.     By granting Defendants awards in excess of what was authorized under the Plan and "spring-loading" stock options, Boyd, Holt and Bagley have caused and will cause the Company to waste valuable corporate assets.

95.     By granting Defendants awards in excess of the amount allowed under the Plan and "spring-loading" stock options, Boyd, Holt and Bagley granted Defendants awards that no director of ordinary sound business judgment would award, so as to constitute waste.

96.     As a result of this waste of corporate assets, Boyd, Holt and Bagley are liable to the Company.

97.     Plaintiff and the Company have no adequate remedy at law.

**PRAYER FOR RELIEF**

A.      Declaring that the award of 250,000 stock options and 100,000 shares of restricted stock granted to Chioini in 2014 were not authorized by the Plan;

B.      Rescinding the excess 250,000 stock options and 100,000 shares of restricted stock granted to Chioini;

28

C.     Rescinding the stock options granted to Defendants on October 1, 2014, 2015;

D.     Awarding damages against all Defendants in favor of the Company as a result of Defendants' breaches of fiduciary duties, plus pre-judgment and post-judgment interest;

E.     A declaration that the 2014 Proxy is false and misleading;

F.     An order requiring the Company to correct the 2014 Proxy and provide shareholders with an opportunity to revote on the Plan amendments;

G.     Equitable and/or injunctive relief as necessary or permitted by law and equity, including disgorgement, attachment, impoundment, and/or imposition of a constructive trust on or otherwise restricting the disposition/exercise of the challenged equity grants discussed herein;

H.     Prohibiting Rockwell, the Board, and the Compensation Committee from making any further awards under the Plan until the Company's internal controls and procedures have been improved and reformed to ensure that future awards comply with the Plan, applicable law, and Defendants' fiduciary duties;

I.     Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance of fees and costs for Plaintiff's attorneys, experts, and accountants; and

29

J.      Granting Plaintiff such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 1, 2015              Respectfully submitted,

/s/ Paul F. Novak
Paul F. Novak (P39524)
Diana Gjonaj (P74637)
MILBERG LLP
719 Griswold St., Suite 620
Detroit, Michigan 48226
Tel:    (313) 309-1760
Fax:   (313) 447-2038
pnovak@milberg.com
dgjonaj@milberg.com

LEVI & KORSINSKY, LLP
Steven J. Purcell
30 Broad Street, 24th Floor
New York, New York 10004
Tel:    (212) 363-7500
Fax:   (212) 363-7171
spurcell@zlk.com

*Attorneys for Plaintiff*

4845-4505-2970, v.  1

## <u>VERIFICATION</u>

I, Donald E. Sherry, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Dated: November _16_, 2015

_Donald E. Sherry_
Donald E. Sherry

# EXHIBIT A



30 Broad Street, 24th Floor
New York, NY 10004
T: 212-363-7500 x114
F: 866-367-6510
www.zlk.com

Steven J. Purcell
spurcell@zlk.com

January 8, 2015

**VIA FEDEX**

The Board of Directors
Rockwell Medical, Inc.
30142 Wixom Road
Wixom, Michigan 48393

Re:   **Demand upon the Board of Directors to Investigate Claims, Initiate Legal Action and Take Necessary and Appropriate Remedial Measures**

To the Board of Directors of Rockwell Medical, Inc.:

This firm represents David H. Stern and Donald E. Sherry, who are, and have been continuously, shareholders of Rockwell Medical, Inc. ("Rockwell" or the "Company") since 2013.

This demand is made on behalf of the Company and concerns the conduct of Rockwell's Board of Directors (the "Board"). Specifically, as described further below, this demand arises from various improper grants of equity awards made by the Board in violation of the terms of the Company's shareholder-approved Amended and Restated 2007 Long Term Incentive Plan (the "Plan"), including: (a) grants of "spring-loaded" options, and (b) grants of equity awards in excess of the Plan's individual fiscal-year limit.

## I.   *The Board Granted "Spring-loaded" Stock Options in Violation of the Terms and Objectives of the Company's Shareholder-Approved Plan*

Since 2005, the Board has consisted of just four members: (a) non-employee directors Ronald D. Boyd ("Boyd"), Kenneth L. Holt ("Holt"), and Patrick J. Bagley ("Bagley"), and (b) Robert L. Chioini ("Chioini"), the Company's founder, Chairman of the Board, President, and Chief Exectuvie Officer.   Boyd, Holt, and Bagley also comprise the Board's compensation committee (the "Compensation Committee"). In 2007, the Board adopted and the Company's shareholders approved the Plan. Various amendments to the Plan have been approved over the years, with the most recent amendments having been approved by the Company's shareholders on May 22, 2014.  The Plan provides the Compensation Committee with the authority to grant various equity awards to themselves, any other non-employee directors, executive officers, other employees, and consultants of the Company.

Page 2 of 6
January 8, 2015

  Section 2.3 of the Plan states that "[n]o Option may be granted with an exercise price below 100% of the Fair Market Value of Common Stock on the Grant Date."[1] This requirement ensures that the recipient of the stock options will only receive value if the Company's stock price improves after the date of grant, thus incentivizing the recipient to work hard and improve the Company's performance. As described below, however, the Compensation Committee granted stock options to themselves and various executive officers of the Company just prior to the release of material information that caused Rockwell's stock price to rise, and made these grants with the intent of circumventing the shareholder-approved restriction requiring that the exercise price be no less than the fair market value of the the Company's common stock on the date of the grant. This practice – known as "spring-loading" – constitutes a violation of the terms and objectives of the Plan and is a breach of fiduciary duty. As the Delaware Court of Chancery stated in *In re Tyson Foods Consol. S'holder Litig.*, 919 A.2d 563, 592 (Del. Ch. 2007), a corporate director violates the fiduciary duty of loyalty by soliciting shareholder approval of an equity incentive plan and then "distribut[ing] shares to managers in such a way as to undermine the very objectives approved by shareholders."

  As disclosed in Forms 4 filed with the United States Securities and Exchange Commission (the "SEC") on October 1 and 3, 2014, the Compensation Committee granted themselves and various executive officers an aggregate of 825,000 stock options under the Plan as follows:

| Name | Position | Number of Options |
|---|---|---|
| Robert Chioni | Chairman, President & CEO | 500,000 |
| Thomas Klema | Vice President and CFO | 120,000 |
| Ajay Gupta | Chief Scientific Officer | 50,000 |
| Raymond Pratt | VP of Drug Development | 50,000 |
| Kenneth Holt | Director | 35,000 |
| Ronald Boyd | Director | 35,000 |
| Patrick Bagley | Director | 35,000 |
| **Total** | | **825,000** |

  The stock options had an exercise price of $8.88, the closing price of the Company's stock on the NASDAQ on October 1, 2014, the date of grant. Just two days later, on October 3, 2014, the Company issued a press release announcing that Rockwell had entered into an exclusive distribution agreement with Baxter Healthcare Corporation. The press release stated, in part:

WIXOM, MICHIGAN, October 3, 2014 — Rockwell Medical, Inc. (NASDAQ: RMTI), a fully-integrated biopharmaceutical company targeting end-stage renal disease (ESRD) and chronic kidney disease (CKD) with innovative products and services for the treatment of iron replacement, secondary hyperparathyroidism and hemodialysis, announced today that it has signed an exclusive agreement with Baxter Healthcare Corporation, a subsidiary of Baxter International Inc. (NYSE:BAX), to commercialize Rockwell's hemodialysis concentrate product line in the U.S. and in select overseas markets.

---

[1] "Fair Market Value" is defined in Section 1.4(p) of the Plan to mean "the closing price of the Common Stock on the Stock Exchange for the Grant Date." "Stock Exchange" is defined in Section 1.4(ff) of the Plan to mean "the principal national securities exchange on which the Common Stock is listed for trading[.]"

Under the terms of the agreement, Baxter will become the exclusive distributor of Rockwell's hemodialysis concentrate and ancillary products in the U.S. and selected foreign countries for an initial term of 10 years.  Baxter can extend the agreement for two additional 5-year terms upon meeting certain sales targets, coupled with a $7.5 million payment related to the first extension.  Baxter will purchase products from Rockwell at a pre-determined gross margin-based price per unit and is required to meet minimum annual purchase levels in order to retain their exclusive rights. Baxter will leverage Rockwell's unique distribution operations in order to provide specialized customer and delivery service for concentrates, covering Rockwell's costs for these services. Rockwell will retain sales, marketing and distribution rights for its hemodialysis concentrate products in certain foreign countries in which it has an established commercial presence.

In consideration for the exclusive commercialization rights, Baxter will pay Rockwell $20 million in cash. Baxter will also purchase $15 million of Rockwell common stock. The investment in Rockwell shares is being made at a price per share equal to the average closing price of RMTI shares over the last 12 months (or $11.39 per share).  Rockwell is eligible for milestone payments totaling $10 million related to the expansion of its manufacturing capabilities to serve customers across the U.S.

Various executive officers chimed in on the importance of the agreement with Baxter. As stated in the press release:

"This long-term, strategic supply and distribution agreement enables Rockwell to expand and accelerate our hemodialysis concentrate business, while we continue to strategically build our drug pharma business in the U.S. and globally," stated Robert L. Chioini, Founder, Chairman and CEO of Rockwell.  "We are excited to be partnering with Baxter, a global market leader who has a proven track record in the field of dialysis and renal products.  This agreement benefits dialysis patients and service providers by expanding access to our market leading products in new territories, while reducing future risk."

 Jill Schaaf, Corporate Vice President and President of Baxter's Renal business, added, "Baxter remains committed to addressing the needs of patients and healthcare providers with a comprehensive range of therapeutic options across home, in-center and hospital settings.  This partnership enhances Baxter's product portfolio with the addition of Rockwell's high-quality hemodialysis concentrate products."

In response to this news, Rockwell stock traded at tremendous volume with 3,187,940 shares (more than the 10 times the 30-day average trading volume of 295,283 shares) changing hands to close at $10.63 on October 3, 2014. As of the market's close on October 3, 2014, the October 1, 2014 awards were already "in the money" by $1.75 per share.

Given the importance of the agreement, there is no doubt that Boyd, Holt and Bagley were aware as of October 1, 2014 that the Company was on the verge of publicly announcing its deal with Baxter. The timing of the stock option grants just two days prior was no coincidence. During each of the past four years, the compensation of the Company's non-employee directors has consisted of an *annual* grant of stock options made in *January*. On January 11, 2011, Boyd, Holt and Bagley granted themselves options to purchase 50,000 shares of Rockwell common stock. On January 5, 2012, Boyd, Holt and Bagley granted themselves options to purchase 25,000 shares of Rockwell common stock. On January 31, 2013, Boyd, Holt and Bagley granted themselves options to purchase 25,000 shares of Rockwell common stock. And on January 13, 2014, Boyd, Holt and Bagley granted themselves options to purchase 35,000 shares of Rockwell stock. Boyd, Holt and Bagley's sudden decision to grant themselves a second round of stock options for 2014 on October 1 2014 is powerful evidence that their intent was to take advantage of the expected stock gains that would occur after the announcement of the deal with Baxter. Likewise, Boyd, Holt, and Bagley have historically granted equity awards to the Company's executive officers in either January and/or June; thus, the timing of the October 1, 2014 award also does not align with the past grants made to the Company's executive officers. Similarly incriminating is that the Board and the Company's executive officers chose not to disclose this unusually-timed grant in any 8-K filing. Other than the Forms 4 filed by the recipients (which they are required to file pursuant to the federal securities laws), the Company has to this date made no disclosure that these grants were made. This again is a suspicious departure from the Company's practices. *See, e.g.,* June 19, 2013 8-K in which Rockwell announced equity awards made to executive officers; June 14, 2012 8-K in which Rockwell announced equity awards made to executive officers; August 19, 2010 8-K in which Rockwell announced equity awards made to executive officers; January 20, 2010 8-K in which Rockwell announced salary increases and equity awards for executive officers.

## II.   *The Compensation Committee Granted Equity Awards to Chioini in Excess of the Plan's Individual Fiscal-Year Limits*

Section 7.3 of the Plan, as most recently approved by shareholders in May 2014, provides that during any fiscal year no individual employee may be granted awards of stock options covering more than 500,000 shares or awards of restricted stock covering more than 200,000 shares (the "Limits"). Specifically, Section 7.3 states, "no Participant in any one fiscal year of the Corporation may be granted (a) Options or Stock Appreciation Rights with respect to more than five hundred thousand (500,000) shares of Common Stock; [and] (b) Restricted Stock or Restricted Stock Units that are denominated in shares of Common Stock with respect to more than two hundred thousand (200,000) shares[.]"

On January 13, 2014, Chioini was granted 250,000 stock options and 100,000 shares of restricted stock under the Plan. Then, on October 1, 2014, Chioini was granted 500,000 stock options and 200,000 shares of restricted stock under the Plan. These grants were disclosed in a SC 13D/A and Forms 4 filed by Chioini with the SEC. Accordingly, during the 2014 fiscal year, Chioini was granted a total of 750,000 stock options and 300,000 shares of restricted stock under the Plan, exceeding the Limits by 250,000 stock options and 100,000 shares of restricted stock.

Each director owes Rockwell and its shareholders the fiduciary duties of loyalty, good faith, and due care. By approving and/or accepting awards in violation of the terms of the Plan, the

Board exceeded its authority and breached its fiduciary duties. The violations of express and unambiguous provisions in the Plan were not, and could not have been, valid exercises of business judgment. As a result of the Board's actions, Rockwell has been damaged and is entitled to relief.

Moreover, based on the above, it is apparent that Rockwell has certain material weaknesses in its internal controls. As a Michigan corporation and a company that trades on the NASDAQ, Rockwell is subject to corporate governance rules and regulations with respect to internal controls over the issuance of stock-based compensation. Failure to comply with such rules and regulations subjects the Company to a risk of various forms of economic and non-economic harms, including reputational damage, regulatory penalties, and NASDAQ de-listing. The violations of the Plan described above demonstrate material weaknesses in the Company's controls with respect to the issuance and financial reporting of stock-based compensation.

Accordingly, our clients, on behalf of the Company, demand that the Board:

1. Rescind the 825,000 stock options granted on October 1, 2014, and seek any further appropriate relief on behalf of the Company for damages sustained as a result of the misconduct described herein;

2. Rescind the 250,000 stock options and 100,000 shares of restricted stock granted to Chioini in excess of the Limits;

3. Investigate whether there are additional violations of the Plan with respect to any other officers and directors and/or other years beyond what is described in this demand letter, and if so, take appropriate action; and

4. Adopt and implement adequate internal controls and systems at the Company designed to prohibit and prevent a recurrence of the Plan violations described herein and ensure compliance with NASDAQ rules and regulations.

The purpose of this demand letter is to give you the first opportunity to investigate and institute claims on behalf of the Company (or empower appropriate persons to do so) against responsible persons and to implement new and stronger controls that would help to prevent a recurrence of such wrongdoing in the future.

By sending this letter, our clients do not waive any rights or in any way impair their entitlement to seek relief from a court concerning the issues raised herein. Moreover, nothing in this letter shall be read to concede that the Board is in fact capable of independently and appropriately considering the issues described herein or taking the actions demanded herein.

If you fail to respond or contact the undersigned within 90 days, we will presume that you have decided not to pursue any investigation, litigation, or remedial steps and we will take such action as we deem in the best interest of the Company and its shareholders, including but not limited to the institution of an action in a court of law. If you need additional time to consider or act upon the issues raised in this demand letter or have any other questions, please do not hesitate

Page 6 of 6
January 8, 2015

  If you fail to respond or contact the undersigned within 90 days, we will presume that you have decided not to pursue any investigation, litigation, or remedial steps and we will take such action as we deem in the best interest of the Company and its shareholders, including but not limited to the institution of an action in a court of law.  If you need additional time to consider or act upon the issues raised in this demand letter or have any other questions, please do not hesitate to contact me. I look forward to hearing from you, and appreciate your prompt attention to this matter.

           Very truly yours,

           Steven J. Purcell

 Shipment Receipt

## Address Information

**Ship to:**
The Board of Directors
Rockwell Medical, Inc.
30142 Wixom Road

WIXOM, MI
48393
US
1234567890

**Ship from:**
Steven J. Purcell, Esq.
Levi & Korsinsky, LLP
30 Broad Street
24th Floor
New York, NY
10004
US
2123637500

## Shipment Information:

Tracking no.: 772514610521
Ship date: 01/08/2015
Estimated shipping charges: 22.70

## Package Information

Pricing option: FedEx Standard Rate
Service type: Standard Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0.10   LBS
Declared Value: 0.00   USD
Special Services:
Pickup/Drop-off: Drop off package at FedEx location

## Billing Information:

Bill transportation to: MyAccount-445
Your reference: ROCKWELL MEDICAL, INC.
P.O. no.:
Invoice no.:
Department no.:

**Thank you for shipping online with FedEx ShipManager at fedex.com.**

## Please Note

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

# EXHIBIT B



Dykema Gossett PLLC
Capitol View
201 Townsend Street, Suite 900
Lansing, MI 48933
WWW.DYKEMA.COM
Tel:  (517) 374-9100
Fax:  (517) 374-9191
**Lori McAllister**

Direct Dial: (517) 374-9150
Direct Fax: (855) 258-3519
Email: LMcAllister@dykema.com

April 3, 2015

**Via Email and U.S. Mail**

Steven J. Purcell, Esq.
Levi & Korsinsky LLP
30 Broad Street, 24th Floor
New York, NY 10004

Re:    Demand upon the Board of Directors

Dear Mr. Purcell:

I am writing in response to your demand upon the Board of Directors of Rockwell Medical, Inc. ("Rockwell") to "investigate claims, initiate legal action and take necessary and appropriate remedial measures" dated January 8, 2015 (the "Demand").  As set forth in this letter, Rockwell has determined that the maintenance of a derivative proceeding is not in the best interests of the corporation.

Michigan law provides that a determination of whether a derivative proceeding is in the best interests of the corporation may be made by any 1 of the following ways:

> (a) By a majority vote of the disinterested directors, if the disinterested directors constitute a quorum at a meeting of the board;

> (b) By a majority vote of a committee consisting of 2 or more disinterested directors appointed by a majority vote of disinterested directors present at a meeting of the board, whether or not the disinterested directors constitute a quorum at the meeting;

> (c) By a panel of 1 or more disinterested persons appointed by the court upon motion by the corporation;

> (d) By all disinterested independent directors.

MCL 450.1495(2)(c).

California | Illinois | Michigan | Minnesota | Texas | Washington, D.C.

DYKEMA

Steven J. Purcell, Esq.
April 3, 2015
Page 2

Rockwell proceeded pursuant to MCL 450.1495(2)(c) to request that a court of proper jurisdiction appoint a "disinterested person" to conduct a reasonable investigation and make a good faith determination as to whether maintenance of a derivative proceeding is in the best interests of the corporation. On February 23, 2015, Rockwell filed a petition with the Oakland County Circuit Court in the State of Michigan to appoint attorney S. Thomas Wienner of Wienner & Gould P.C. to investigate the Demand. The Court was provided with a copy of the Demand and Mr. Wienner's qualifications. As noted in the petition, Mr. Wienner has never been an officer, employee, or director of Rockwell, and neither Mr. Wienner or his firm has ever performed any services for Rockwell in connection with the transactions at issue in the Demand or otherwise. Mr. Wienner is an exceptionally well-qualified attorney who has represented both plaintiffs and defendants, and received numerous peer recognition awards for his skills as an attorney. On March 6, 2015, Judge Wendy Potts granted Rockwell's petition and appointed Mr. Wienner to serve as the disinterested person pursuant to statute. A copy of the petition and the Order are attached for your information.

Mr. Wienner conducted a comprehensive and thorough investigation of the claims asserted in your Demand and was not limited by Rockwell in any way. His investigation included reviewing relevant background documents, interviews of each member of Rockwell's Board of Directors as well as the Chief Financial Officer, legal research and analysis, and financial research and analysis. Mr. Wienner's investigation and Report led him to the following conclusion:

> On the basis of my investigation of the claims asserted in the Shareholder Demand, it is my determination in good faith as a disinterested person pursuant to MCL 450.1495(2)(c) that it would not be in the best interests of Rockwell Medical, Inc. for the Company to pursue directly any of the claims asserted in the Shareholder Demand or to permit the maintenance of a derivative action arising out of those claims.

The Board's response to the Demand is governed by the determination reached by the disinterested person appointed by the Court. Now that the determination has been made in the manner specified by the Michigan Business Corporation Act, the applicable statute provides that any action that you might consider bringing must be dismissed unless you can establish that the determination was not made in good faith or that the investigation was not reasonable. MCL 450.1495(1). Neither of these arguments can be made based on the facts and circumstances here and the determination of the Court's appointed disinterested person. If an action is filed by you, we are placing you on notice that Rockwell will vigorously defend such action and seek appropriate sanctions from the Court for filing a frivolous action.

DYKEMA

Steven J. Purcell, Esq.
April 3, 2015
Page 3


Sincerely,

**DYKEMA GOSSETT** PLLC

Lori McAllister

LMSI
Attachments


LAN01\377225.1
ID\LMSI - 101129\0015

California | Illinois | Michigan | Minnesota | Texas | Washington, D.C.

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

DYKEMA GOSSETT-A PROFESSIONAL LIMITED LIABILITY COMPANY-CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900-LANSING, MICHIGAN 48933

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

In re Appointment of Disinterested Person as
to ROCKWELL MEDICAL, INC.

Case No. 15- 2015-145372-CB
JUDGE POTTS

Hon. _____

---

Lori McAllister (P39501)
Andrew J. Kolozsvary (P68885)
DYKEMA GOSSETT PLLC
Attorneys for Petitioner
Rockwell Medical, Inc.
201 Townsend Street, Suite 900
Lansing, MI 48933
(517) 374-9150

---

## BRIEF IN SUPPORT OF PETITIONER ROCKWELL MEDICAL, INC.'S PETITION TO APPOINT S. THOMAS WIENNER AS DISINTERESTED PERSON UNDER MCL 450.1495(2)(c) TO INVESTIGATE DERIVATIVE DEMAND

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900·LANSING, MICHIGAN 48933

### INTRODUCTION

Rockwell Medical, Inc. seeks the appointment of a "disinterested person" pursuant to MCL 450.1495(2)(c) to investigate a shareholder derivative demand. On information and belief, no civil action involving the allegations in the derivative demand is currently pending, as a shareholder may not commence a derivative proceeding until ninety days have expired from the date of the written demand, *see* MCL 450.1493a, and the written demand at issue here was made on January 8, 2015, approximately 45 days ago. MCL 450.1495(2)(c) authorizes the Court, upon motion by the corporation, to appoint a "disinterested person" to conduct a reasonable investigation and make a good faith determination as to whether maintenance of a derivative proceeding is in the best interests of the corporation. Rockwell hereby requests that the Court appoint S. Thomas Wienner to investigate the January 8, 2015 demand made upon it.

### BACKGROUND

On January 8, 2015, David H. Stern and Donald E. Sherry, through counsel, Steven J. Purcell of the law firm of Levi & Korsinsky LLP in New York City, sent Rockwell Medical, Inc.'s Board of Directors a written demand that the Company take action with respect to certain grants of equity awards made in October 2014. (Derivative Demand, attached as Exhibit A.) Messrs. Stern and Sherry allege that they are shareholders of Rockwell, and take issue with stock options granted to certain officers and directors of the Company on October 1 and October 3, 2014, as well as with restricted stock units granted to the Company's CEO on October 1, 2014.

The demand letter states that its purpose is "to give you the first opportunity to investigate and institute claims on behalf of the Company (or empower appropriate persons to do so) against responsible persons and to implement new and stronger controls that would help to prevent a recurrence of such wrongdoing in the future." *Id.* The demand letter gives Rockwell ninety days to respond: "If you fail to respond or contact the undersigned within 90 days, we will

presume that you have decided not to pursue any investigation, litigation, or remedial steps and we will take such action as we deem in the best interest of the Company and its shareholders, including but not limited to the institution of an action in a court of law." *Id.*

The Company desires to pursue an investigation into the allegations and requests in the demand letter through the appointment of a "disinterested person" under MCL 450.1495(2)(c), thus necessitating the filing of this Petition.

**ARGUMENT**

When a corporation receives a shareholder demand for the corporation to pursue a claim, the corporation has several options under Michigan's Business Corporations Act for investigating the circumstances and determining whether litigation is in the corporation's best interests. MCL 450.1495. One of those options is for "a panel of 1 or more disinterested persons appointed by the court upon motion by the corporation" to undertake an investigation. MCL 450.1495(2)(c); *see also Virginia M Damon Trust v North Country Fin Corp*, 406 F Supp 2d 796 (WD Mich, 2005) (appointing disinterested person to conduct investigation and evaluate derivative suit).

Pursuant to MCL 450.1495(2)(c), Rockwell requests that the Court appoint S. Thomas Wienner of Wienner & Gould, P.C. to conduct a reasonable investigation and make a good faith determination as to whether the maintenance of a derivative proceeding is in the best interests of the Company. Mr. Wienner is a "disinterested person." No claim is asserted against him in the demand letter, and he has never been an officer, employee, or director of Rockwell. (Affidavit of Mr. Wienner, attached as Exhibit B.) Moreover, Rockwell is not a client of Mr. Wienner or Wienner & Gould, P.C., and Mr. Wienner has never performed any services for Rockwell, in connection with the transactions at issue in the demand letter or otherwise. (*Id.*)

3

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN 48933

Mr. Wienner is exceptionally well-qualified to review the derivative claims and the relief sought. As his curriculum vitae (attached hereto as Exhibit C) demonstrates, Mr. Wienner has been a practicing attorney since 1978, and has achieved numerous awards and peer recognition for his outstanding skills. Mr. Wienner has extensive experience in commercial litigation, including securities lawsuits and arbitrations, and contractual and other business lawsuits. He is viewed as a leading business lawyer, as evidenced in part by his honors as a Fellow of the Litigation Counsel of America, and recognitions as a Best Lawyer by U.S. News & World Report.

In sum, Mr. Wienner is extremely well qualified to investigate the demand and to determine whether it is in Rockwell's best interests to pursue any of the derivative claims. Mr. Wienner has committed to conducting the investigation expeditiously and presenting his findings within 40 days of entry of the order appointing him. Accordingly, Rockwell requests that this Court appoint Mr. Wienner to act as the disinterested person pursuant to MCL 450.1495(2)(c) to evaluate the derivative claims.

## CONCLUSION

For the foregoing reasons, Rockwell respectfully requests that the Court grant its petition and enter an Order appointing S. Thomas Wienner as a "disinterested person" to investigate and make a determination regarding the January 8, 2015 derivative demand pursuant to MCL 450.1495(2)(c).

4

*(left margin, rotated)* Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN 48933

DYKEMA GOSSETT PLLC

By:*/s/Lori McAllister*
   Lori McAllister (P39501)
   Andrew J. Kolozsvary (P68885)
   Attorney for Petitioner Rockwell Medical, Inc.
   201 Townsend St., Ste. 900
   Lansing, MI 48933
   (517) 374-9150

Dated:  February 23, 2015

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•CAPITOL VIEW, 201 TOWNSEND STREET, SUITE 900•LANSING, MICHIGAN 48933

5

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

# EXHIBIT A

# LEVI&KORSINSKY LLP

30 Broad Street, 24th Floor
New York, NY 10004
T: 212-363-7500 x114
F: 866-367-6510
www.zlk.com

Steven J. Purcell
spurcell@zlk.com

January 8, 2015

**VIA FEDEX**

The Board of Directors
Rockwell Medical, Inc.
30142 Wixom Road
Wixom, Michigan 48393

> **Re:   Demand upon the Board of Directors to Investigate Claims, Initiate Legal Action and Take Necessary and Appropriate Remedial Measures**

To the Board of Directors of Rockwell Medical, Inc.:

This firm represents David H. Stern and Donald E. Sherry, who are, and have been continuously, shareholders of Rockwell Medical, Inc. ("Rockwell" or the "Company") since 2013.

This demand is made on behalf of the Company and concerns the conduct of Rockwell's Board of Directors (the "Board"). Specifically, as described further below, this demand arises from various improper grants of equity awards made by the Board in violation of the terms of the Company's shareholder-approved Amended and Restated 2007 Long Term Incentive Plan (the "Plan"), including: (a) grants of "spring-loaded" options, and (b) grants of equity awards in excess of the Plan's individual fiscal-year limit.

## I.   *The Board Granted "Spring-loaded" Stock Options in Violation of the Terms and Objectives of the Company's Shareholder-Approved Plan*

Since 2005, the Board has consisted of just four members: (a) non-employee directors Ronald D. Boyd ("Boyd"), Kenneth L. Holt ("Holt"), and Patrick J. Bagley ("Bagley"), and (b) Robert L. Chioini ("Chioini"), the Company's founder, Chairman of the Board, President, and Chief Exectuvie Officer.   Boyd, Holt, and Bagley also comprise the Board's compensation committee (the "Compensation Committee"). In 2007, the Board adopted and the Company's shareholders approved the Plan. Various amendments to the Plan have been approved over the years, with the most recent amendments having been approved by the Company's shareholders on May 22, 2014.  The Plan provides the Compensation Committee with the authority to grant various equity awards to themselves, any other non-employee directors, executive officers, other employees, and consultants of the Company.

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

Section 2.3 of the Plan states that "[n]o Option may be granted with an exercise price below 100% of the Fair Market Value of Common Stock on the Grant Date."[1] This requirement ensures that the recipient of the stock options will only receive value if the Company's stock price improves after the date of grant, thus incentivizing the recipient to work hard and improve the Company's performance. As described below, however, the Compensation Committee granted stock options to themselves and various executive officers of the Company just prior to the release of material information that caused Rockwell's stock price to rise, and made these grants with the intent of circumventing the shareholder-approved restriction requiring that the exercise price be no less than the fair market value of the the Company's common stock on the date of the grant. This practice – known as "spring-loading" – constitutes a violation of the terms and objectives of the Plan and is a breach of fiduciary duty. As the Delaware Court of Chancery stated in *In re Tyson Foods Consol. S'holder Litig.*, 919 A.2d 563, 592 (Del. Ch. 2007), a corporate director violates the fiduciary duty of loyalty by soliciting shareholder approval of an equity incentive plan and then "distribut[ing] shares to managers in such a way as to undermine the very objectives approved by shareholders."

As disclosed in Forms 4 filed with the United States Securities and Exchange Commission (the "SEC") on October 1 and 3, 2014, the Compensation Committee granted themselves and various executive officers an aggregate of 825,000 stock options under the Plan as follows:

| Name | Position | Number of Options |
|---|---|---|
| Robert Chioni | Chairman, President & CEO | 500,000 |
| Thomas Klema | Vice President and CFO | 120,000 |
| Ajay Gupta | Chief Scientific Officer | 50,000 |
| Raymond Pratt | VP of Drug Development | 50,000 |
| Kenneth Holt | Director | 35,000 |
| Ronald Boyd | Director | 35,000 |
| Patrick Bagley | Director | 35,000 |
| **Total** | | **825,000** |

The stock options had an exercise price of $8.88, the closing price of the Company's stock on the NASDAQ on October 1, 2014, the date of grant. Just two days later, on October 3, 2014, the Company issued a press release announcing that Rockwell had entered into an exclusive distribution agreement with Baxter Healthcare Corporation. The press release stated, in part:

WIXOM, MICHIGAN, October 3, 2014 — Rockwell Medical, Inc. (NASDAQ: RMTI), a fully-integrated biopharmaceutical company targeting end-stage renal disease (ESRD) and chronic kidney disease (CKD) with innovative products and services for the treatment of iron replacement, secondary hyperparathyroidism and hemodialysis, announced today that it has signed an exclusive agreement with Baxter Healthcare Corporation, a subsidiary of Baxter International Inc.

---

[1] "Fair Market Value" is defined in Section 1.4(p) of the Plan to mean "the closing price of the Common Stock on the Stock Exchange for the Grant Date." "Stock Exchange" is defined in Section 1.4(ff) of the Plan to mean "the principal national securities exchange on which the Common Stock is listed for trading[.]"

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

(NYSE:BAX), to commercialize Rockwell's hemodialysis concentrate product line in the U.S. and in select overseas markets.

Under the terms of the agreement, Baxter will become the exclusive distributor of Rockwell's hemodialysis concentrate and ancillary products in the U.S. and selected foreign countries for an initial term of 10 years. Baxter can extend the agreement for two additional 5-year terms upon meeting certain sales targets, coupled with a $7.5 million payment related to the first extension. Baxter will purchase products from Rockwell at a pre-determined gross margin-based price per unit and is required to meet minimum annual purchase levels in order to retain their exclusive rights. Baxter will leverage Rockwell's unique distribution operations in order to provide specialized customer and delivery service for concentrates, covering Rockwell's costs for these services. Rockwell will retain sales, marketing and distribution rights for its hemodialysis concentrate products in certain foreign countries in which it has an established commercial presence.

In consideration for the exclusive commercialization rights, Baxter will pay Rockwell $20 million in cash. Baxter will also purchase $15 million of Rockwell common stock. The investment in Rockwell shares is being made at a price per share equal to the average closing price of RMTI shares over the last 12 months (or $11.39 per share). Rockwell is eligible for milestone payments totaling $10 million related to the expansion of its manufacturing capabilities to serve customers across the U.S.

Various executive officers chimed in on the importance of the agreement with Baxter. As stated in the press release:

"This long-term, strategic supply and distribution agreement enables Rockwell to expand and accelerate our hemodialysis concentrate business, while we continue to strategically build our drug pharma business in the U.S. and globally," stated Robert L. Chioini, Founder, Chairman and CEO of Rockwell. "We are excited to be partnering with Baxter, a global market leader who has a proven track record in the field of dialysis and renal products. This agreement benefits dialysis patients and service providers by expanding access to our market leading products in new territories, while reducing future risk."

Jill Schaaf, Corporate Vice President and President of Baxter's Renal business, added, "Baxter remains committed to addressing the needs of patients and healthcare providers with a comprehensive range of therapeutic options across home, in-center and hospital settings. This partnership enhances Baxter's product portfolio with the addition of Rockwell's high-quality hemodialysis concentrate products."

In response to this news, Rockwell stock traded at tremendous volume with 3,187,940 shares (more than the 10 times the 30-day average trading volume of 295,283 shares) changing

hands to close at $10.63 on October 3, 2014. As of the market's close on October 3, 2014, the October 1, 2014 awards were already "in the money" by $1.75 per share.

Given the importance of the agreement, there is no doubt that Boyd, Holt and Bagley were aware as of October 1, 2014 that the Company was on the verge of publicly announcing its deal with Baxter. The timing of the stock option grants just two days prior was no coincidence. During each of the past four years, the compensation of the Company's non-employee directors has consisted of an *annual* grant of stock options made in *January*. On January 11, 2011, Boyd, Holt and Bagley granted themselves options to purchase 50,000 shares of Rockwell common stock. On January 5, 2012, Boyd, Holt and Bagley granted themselves options to purchase 25,000 shares of Rockwell common stock. On January 31, 2013, Boyd, Holt and Bagley granted themselves options to purchase 25,000 shares of Rockwell common stock. And on January 13, 2014, Boyd, Holt and Bagley granted themselves options to purchase 35,000 shares of Rockwell stock. Boyd, Holt and Bagley's sudden decision to grant themselves a second round of stock options for 2014 on October 1 2014 is powerful evidence that their intent was to take advantage of the expected stock gains that would occur after the announcement of the deal with Baxter. Likewise, Boyd, Holt, and Bagley have historically granted equity awards to the Company's executive officers in either January and/or June; thus, the timing of the October 1, 2014 award also does not align with the past grants made to the Company's executive officers. Similarly incriminating is that the Board and the Company's executive officers chose not to disclose this unusually-timed grant in any 8-K filing. Other than the Forms 4 filed by the recipients (which they are required to file pursuant to the federal securities laws), the Company has to this date made no disclosure that these grants were made. This again is a suspicious departure from the Company's practices. *See, e.g.,* June 19, 2013 8-K in which Rockwell announced equity awards made to executive officers; June 14, 2012 8-K in which Rockwell announced equity awards made to executive officers; August 19, 2010 8-K in which Rockwell announced equity awards made to executive officers; January 20, 2010 8-K in which Rockwell announced salary increases and equity awards for executive officers.

## II.   The Compensation Committee Granted Equity Awards to Chioini in Excess of the Plan's Individual Fiscal-Year Limits

Section 7.3 of the Plan, as most recently approved by shareholders in May 2014, provides that during any fiscal year no individual employee may be granted awards of stock options covering more than 500,000 shares or awards of restricted stock covering more than 200,000 shares (the "Limits"). Specifically, Section 7.3 states, "no Participant in any one fiscal year of the Corporation may be granted (a) Options or Stock Appreciation Rights with respect to more than five hundred thousand (500,000) shares of Common Stock; [and] (b) Restricted Stock or Restricted Stock Units that are denominated in shares of Common Stock with respect to more than two hundred thousand (200,000) shares[.]"

On January 13, 2014, Chioini was granted 250,000 stock options and 100,000 shares of restricted stock under the Plan. Then, on October 1, 2014, Chioini was granted 500,000 stock options and 200,000 shares of restricted stock under the Plan. These grants were disclosed in a SC 13D/A and Forms 4 filed by Chioini with the SEC. Accordingly, during the 2014 fiscal year,

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

Page 5 of 6
January 8, 2015

Chioini was granted a total of 750,000 stock options and 300,000 shares of restricted stock under the Plan, exceeding the Limits by 250,000 stock options and 100,000 shares of restricted stock.

Each director owes Rockwell and its shareholders the fiduciary duties of loyalty, good faith, and due care. By approving and/or accepting awards in violation of the terms of the Plan, the Board exceeded its authority and breached its fiduciary duties. The violations of express and unambiguous provisions in the Plan were not, and could not have been, valid exercises of business judgment. As a result of the Board's actions, Rockwell has been damaged and is entitled to relief.

Moreover, based on the above, it is apparent that Rockwell has certain material weaknesses in its internal controls. As a Michigan corporation and a company that trades on the NASDAQ, Rockwell is subject to corporate governance rules and regulations with respect to internal controls over the issuance of stock-based compensation. Failure to comply with such rules and regulations subjects the Company to a risk of various forms of economic and non-economic harms, including reputational damage, regulatory penalties, and NASDAQ de-listing. The violations of the Plan described above demonstrate material weaknesses in the Company's controls with respect to the issuance and financial reporting of stock-based compensation.

Accordingly, our clients, on behalf of the Company, demand that the Board:

1. Rescind the 825,000 stock options granted on October 1, 2014, and seek any further appropriate relief on behalf of the Company for damages sustained as a result of the misconduct described herein;

2. Rescind the 250,000 stock options and 100,000 shares of restricted stock granted to Chioini in excess of the Limits;

3. Investigate whether there are additional violations of the Plan with respect to any other officers and directors and/or other years beyond what is described in this demand letter, and if so, take appropriate action; and

4. Adopt and implement adequate internal controls and systems at the Company designed to prohibit and prevent a recurrence of the Plan violations described herein and ensure compliance with NASDAQ rules and regulations.

The purpose of this demand letter is to give you the first opportunity to investigate and institute claims on behalf of the Company (or empower appropriate persons to do so) against responsible persons and to implement new and stronger controls that would help to prevent a recurrence of such wrongdoing in the future.

By sending this letter, our clients do not waive any rights or in any way impair their entitlement to seek relief from a court concerning the issues raised herein. Moreover, nothing in this letter shall be read to concede that the Board is in fact capable of independently and appropriately considering the issues described herein or taking the actions demanded herein.

Page 6 of 6
January 8, 2015

    If you fail to respond or contact the undersigned within 90 days, we will presume that you have decided not to pursue any investigation, litigation, or remedial steps and we will take such action as we deem in the best interest of the Company and its shareholders, including but not limited to the institution of an action in a court of law.  If you need additional time to consider or act upon the issues raised in this demand letter or have any other questions, please do not hesitate to contact me. I look forward to hearing from you, and appreciate your prompt attention to this matter.

Very truly yours,

Steven J. Purcell

# EXHIBIT B

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

## AFFIDAVIT OF S. THOMAS WIENNER

S. Thomas Wienner, Esq, being duly sworn, deposes and states that he has information and knowledge sufficient to form a basis for the facts set forth in this Affidavit:

1.　　I have been asked by Rockwell Medical, Inc. whether I would be willing to serve as a "disinterested person" pursuant to MCL 450.1495(2)(c) to conduct a reasonable investigation into a January 8, 2015 written demand made on the Company and make a good faith determination as to whether a derivative proceeding is in the best interests of the Company.

2.　　I am willing and able to serve in that role.

3.　　I have no interest in Rockwell or the transactions put at issue through the January 8, 2015 demand.

4.　　I have never served as an officer, employee, or director of Rockwell.

5.　　Rockwell is not a client of mine or of my firm, Wienner & Gould, P.C.

6.　　I have never provided legal services to Rockwell, in connection with the transactions at issue in the demand letter or otherwise

_____
S. Thomas Wienner

Subscribed and sworn to before me
this _16th_ day of February, 2015.

_____
Notary Public, _Oakland_ County, Michigan
My Commission Expires: _12-17-16_
Acting in the County of _Oakland_

JULIA A. TIBBS
Notary Public, State of Michigan
County of Oakland
My Commission Expires Dec. 17, 2016
Acting in the County of _Oakland_

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

# EXHIBIT C

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

Received for Filing Oakland County Clerk 2015 FEB 23 PM 02:21

# WIENNER & GOULD, P. C.
## S. Thomas Wienner





twienner@wiennergould.com

Phone: 248 641 9401

Fax: 248 652 2729

Tom Wienner graduated *cum laude* in general studies from Harvard College in 1975, and *magna cum laude* from the University of Michigan Law School in 1978. He was a Note and Comment editor of the University of Michigan Journal of Law Reform.

Mr. Wienner has specialized in litigation since 1978. He began his career as an associate at Dykema Gossett in Detroit, and later became the hiring partner and the youngest member of the partner compensation committee. From 1992 until 2003, he was a managing shareholder of Feeney Kellett Wienner & Bush P.C. in Bloomfield Hills, Michigan. Together with Seth Gould, Wienner formed Wienner & Gould P.C. in July 2003.

Mr. Wienner has had extensive first-chair trial experience in both commercial and product liability lawsuits having tried cases in federal and state courts in Michigan and around the country. In commercial litigation, he has a broad range of experience including franchise and employment cases, securities lawsuits and arbitrations, and contractual, trade secret, and other business lawsuits. In product liability cases, Mr. Wienner has represented manufacturers of pharmaceutical products, automobiles, tires, and various consumer goods.

Mr. Wienner is admitted to practice before Michigan state courts, the U.S. District Court for the Eastern District of Michigan, the U.S. District Court for the Western District of Michigan, and the U.S. Court of Appeals for the Sixth Circuit.

Mr. Wienner is a member of various bar associations including the Detroit Metropolitan, Oakland County, State of Michigan, American Bar, and Federal Bar, Business Litigation and Franchise Sections.

Mr. Wienner is ranked as 2015 Best Lawyer by US News.

Martindale-Hubbell, a nationally recognized directory of attorneys, has rated Mr. Wienner "**AV**," the highest possible rating of his legal ability and ethical standards, as established by confidential opinions from members of the Michigan Bar.

As Fellow of the Litigation Counsel of America™, Mr. Wienner is an invitation- only member of the trial lawyer honorary society. Membership is limited to 3,500 Fellows, representing less than one-half of one percent of American lawyers. The composition of the LCA is aggressively diverse, with recognition for excellence among American litigation and trial counsel across all segments of the bar.

Original – Court

| STATE OF MICHIGAN 6TH JUDICIAL CIRCUIT COUNTY OF OAKLAND | NOTICE OF ASSIGNMENT TO THE BUSINESS COURT | CASE NO. |
|---|---|---|

Court address
1200 N Telegraph Rd   Pontiac, MI  48341

Court telephone no.
248-858-0345

| Plaintiff's name(s), address(es), and telephone number(s) | | Defendant's name(s), address(es), and telephone number(s) |
|---|---|---|
| In Re Appointment of Disinterested Person As To Rockwell Medical, Inc. | v | |

| Plaintiff's attorney, bar no., address, telephone no., and email address | Defendant's attorney, bar no., address, telephone no., and email address |
|---|---|
| Dykema Gossett PLLC Lori McAllister (P39501)/Andrew Kolozsvary (P68885) 201 Townsend Street, Suite 900 Lansing, MI 48933/(517) 374-9150 | |

The  ☒ Plaintiff  ☐ Defendant  requests assignment of the above captioned matter to the Business Court. The case qualifies for the Business Court and the matter should be identified as Business Court eligible pursuant to MCL 600.8031, MCL 600.8035, and LAO 2013-xx as indicated below. (Check all that apply.)

The case is a qualifying business or commercial dispute as defined at MCL 600.8031(c):  as

☒ All of the parties are business enterprises;

☐ One or more of the parties is a business enterprise and the other parties are its or their present or former owners, managers shareholders, members, directors, officers, agents, employees, suppliers, or competitors, and the claims arise out of those relationships;

☐ One of the parties is a nonprofit organization and the claims arise out of that party's organizational structure, governance, or finances;

☒ It involves the sale, merger, purchase, combination, dissolution, liquidation, structure, governance, or finances of a business enterprise.

The business or commercial dispute involves:

☐ Information technology, software, or website development, maintenance or hosting;

☒ The internal organization of business entities and the rights or obligations of shareholders, partners, members, owners, officers, directors, or managers;

☐ Contractual agreements or other business dealing, including licensing, trade secrets, intellectual property, antitrust issues, securities, non-compete agreements, non-solicitation agreements, and confidentiality agreements, if all available administrative remedies are completely exhausted, including, but not limited to alternative dispute resolution processes prescribed in the agreements;

☐ Commercial transactions, including commercial bank transactions;

☐ Business or commercial insurance policies; and/or

☐ Commercial real property.

☐ Other:(Please explain)

February 23, 2015
Date

/s/Lori McAllister (P39501)
Name

Attorney for: Rockwell Medical, Inc.

OCBC 01 (05/13) NOTICE OF ASSIGNMENT TO THE BUSINESS COURT

**STATE OF MICHIGAN**

**IN THE CIRCUIT COURT OF THE COUNTY OF OAKLAND**

In re Appointment of Disinterested Person as to
ROCKWELL MEDICAL, INC.

Case No. 15-145672-CB

Hon. Wendy Potts

DYKEMA GOSSETT PLLC
Lori McAllister (P39501)
Andrew J. Kolozsvary (P68885)
Attorneys for Petitioner
Rockwell Medical, Inc.
201 Townsend Street, Suite 900
Lansing, MI 48933
(517) 374-9150
lmcallister@dykema.com
akolozsvary@dykema.com

### ORDER APPOINTING S. THOMAS WIENNER AS DISINTERESTED PERSON PURSUANT TO MCL 450.1495(2)(c)

This matter having come before the Court on Petitioner Rockwell Medical, Inc.'s Petition to Appoint S. Thomas Wienner As Disinterested Person Under MCL 450.1495(2)(c) To Investigate Derivative Demand, and the Court being otherwise advised in the premises:

IT IS HEREBY ORDERED that the Petition is GRANTED and S. Thomas Wienner is hereby appointed as a disinterested person pursuant to MCL 540.1495(2)(c).

SO ORDERED.

DATED: _____ MAR 06 2015

/s/ Judge Wendy Potts
CIRCUIT COURT JUDGE

JH

Received for Filing Oakland County Clerk 2015 MAR 06 AM 11:43