UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD E. SHERRY

      Plaintiff,                                Case No. 15-14198
                                                    Hon. Matthew F. Leitman

v.

ROBERT L. CHIOINI *et al.*,

      Defendants.

_____/

**OPINION AND ORDER (1) GRANTING DEFENDANTS' MOTION TO DISMISS (ECF #15) WITH RESPECT TO COUNTS I, III, AND IV OF PLAINTIFF'S COMPLAINT AND (2) ORDERING SUPPLEMENTAL BRIEFING WITH RESPECT TO COUNT II**

      This is a shareholder derivative action under Michigan law. Plaintiff Donald E. Sherry ("Sherry") is a shareholder of nominal Defendant Rockwell Medical, Inc. ("Rockwell"). Sherry alleges that Rockwell's Board of Directors (the "Board") and certain corporate officers improperly enriched themselves by granting and/or accepting (1) so-called "spring loaded" stock options and/or (2) a greater number of stock options than permitted under the company's compensation plan.

      Prior to filing this action, Sherry sent a letter to the Board identifying this alleged wrongdoing and demanding that Rockwell investigate it and take appropriate action (the "Demand Letter"). In response, Rockwell asked the

Oakland County Circuit Court (the "OCCC") to appoint attorney S. Thomas Wienner ("Wienner") as a disinterested person to investigate Sherry's allegations and to determine whether Rockwell should pursue claims based upon the allegations. After the OCCC appointed Wienner, he conducted an investigation and determined that it would not be in Rockwell's best interest to pursue claims arising out of Sherry's allegations.

The Defendants now move for dismissal of Sherry's claims. They seek that relief under a Michigan statute that, under certain circumstances, requires a court to dismiss derivative claims that a court-appointed disinterested person has determined should not be pursued. (See ECF #15.) For the reasons explained below, the Court **DISMISSES** the claims that were the subject of Wienner's determination (Counts I, III, and IV of the Complaint).

In a separate claim that was neither raised in the Demand Letter nor investigated by Wienner (Count II of the Complaint), Sherry alleges that the Board issued a misleading proxy statement to Rockwell's shareholders in 2014. The Defendants have moved to dismiss this claim on the ground that, among other things, Sherry lacks standing to assert it. For the reasons explained below, the Court concludes that it cannot rule on the motion to dismiss Count II until it receives and reviews supplemental briefs with respect to that claim.

# I

## A

Rockwell is a publicly-traded medical device and biopharmaceutical company. (*See* Wienner Report at 4, ECF #15-10 at 5, Pg. ID 435.)  For most of its history, "the great majority of [Rockwell's] revenues have been derived from the manufacture and sale of concentrate solutions used during hemodialysis." (*Id.* at 6, ECF #15-10 at 7, Pg. ID 437.)

Rockwell's President and CEO is Defendant Robert Chioini ("Chioini"). (*See id.* at 4, ECF #15-10 at 5, Pg. ID 435.)  Chioini also serves as Chairman of the Board. (*See id.*)  The Board includes three outside directors: Defendants Patrick Bagley ("Bagley"), Ronald Boyd ("Boyd"), and Kenneth Holt ("Holt"). (*See id.* at 4-5, ECF #15-10 at 5-6, Pg. ID 435-36.)  Bagley, Boyd, and Holt comprise the Board's "Compensation Committee." (*See id.*)  The remaining Defendants in this action – Thomas Klema ("Klema"), Ajay Gupta ("Gupta"), and Raymond Pratt ("Pratt") – are Rockwell corporate officers. (*See* Compl., ECF #1 at ¶¶ 16-19, Pg. ID 6.)

In 2007, Rockwell's shareholders approved, and the Board adopted, a "Long Term Incentive Plan" (the "Plan"). (*See* Wienner Report at 7, ECF #15-10 at 8, Pg. ID 438.)  The Plan authorizes the Board's Compensation Committee "to grant various equity awards [i.e., stock options] to themselves, any other non-employee

3

directors, executive officers, other employees, and consultants of [Rockwell]." (Compl., ECF #1 at ¶21, Pg. ID 7.)  The Plan further provides that "the exercise price of stock options [granted under the Plan] be set at no less than Rockwell's 'Fair Market Value' on the date of the grant." (*Id.* at ¶36, Pg. ID 12.)  The Plan defines "Fair Market Value" as "the closing price of [Rockwell's] Common Stock on the [NASDAQ] Stock Exchange for the Grant Date." (*Id.*)

On April 4, 2014, the Board filed a Schedule 14A Proxy Statement with the United States Securities and Exchange Commission in which the Board "solicited shareholder approval of amendments to the Plan" (the "2014 Proxy Statement"). (*Id.* at ¶5, Pg. ID 4.)  In the 2014 Proxy Statement, the Board sought to increase the number of stock options that the Compensation Committee could grant in a single fiscal year. (*See id.*)  Rockwell's shareholders approved the amendment on May 22, 2014. (*See id.* at ¶68, Pg. ID 23.)

**B**

The fall of 2014 was an important and busy time for Rockwell.  For years, "Rockwell [had been] attempting to transition from being a medical supplier of dialysis concentrate products to being a specialty pharmaceutical company with higher margins." (Wienner Report at 5, ECF #15-10 at 6, Pg. ID 436.)  Rockwell's "primary effort" in this transformation had been "the development of a drug called Triferic, which is used to replace iron and maintain hemoglobin during

4

hemodialysis treatments." (*Id.*)    In the fall of 2014, the Food and Drug Administration (the "FDA") was nearing a decision on whether to approve Triferic, and it had scheduled a public session to review the drug on November 6, 2014. (*See id.* at 6-7, ECF #15-10 at 7-8, Pg. ID 437-38).

In this same time frame, Rockwell was also negotiating a transaction with Baxter Healthcare Corporation ("Baxter"). (*See* Compl. at ¶4, Pg. ID 3.)   The proposed transaction called for Baxter to "serve as the exclusive distributor of Rockwell's hemodialysis concentrate and ancillary products in the United States and selected foreign countries." (*Id.*)   Chioini, "in his capacity as [P]resident of [Rockwell]" was the person negotiating with Baxter on Rockwell's behalf. (Wienner Dep. at 116, ECF #32-1 at 31, Pg. ID 826.)

On October 1, 2014, the Board met to address the Baxter transaction. (*See id.*)   The Board voted to "authorize[]" the Baxter transaction and to give Chioini the "authority" to complete his negotiations and close on the transaction. (*Id.*)

At the conclusion of the full Board meeting, the Compensation Committee met. (*See* Wienner Report at 9, ECF #15-10 at 10, Pg. ID 440.)   During that meeting, the Compensation Committee granted an aggregate of 825,000 stock options (the "Option Awards") as follows: 500,000 options to Chioini, 120,000 options to Klema, 50,000 options each to Gupta and Pratt, and 35,000 options to each member of the committee. (*See id.* at 9-10, ECF #15-10 at 10-11, Pg. ID 440-

41.)   The "exercise price of the [Option Awards] was $8.88 per share, which, consistent with [the Plan], was the closing price on the NASDAQ exchange [of Rockwell's stock] on October 1, 2014." (*Id.* at 10, ECF #15-10 at 11, Pg. ID 441.) The Option Awards were set "to vest in three equal, annual installments beginning in October 2015." (*Id.*)

Chioini completed his negotiations with Baxter on October 1 and 2, and the two companies issued a joint press release announcing the transaction on October 3. (*See* Compl. at ¶29, Pg. ID 9.)   The press release explained that Baxter would become "the exclusive distributor of Rockwell's hemodialysis concentrate and ancillary products in the U.S. and selected foreign countries" in exchange for a $20 million cash payment to Rockwell and a $15 million purchase of Rockwell's stock. (*Id.*)

The day Rockwell announced the Baxter transaction, Rockwell's stock closed at $10.63 per share, or nearly 20-percent higher than the $8.88 per share closing price two days earlier. (*See id.* at ¶¶ 31-32, Pg. ID 11.)   The increase in Rockwell's share price was short lived.   On October 8, 2014, less than a week later, Rockwell's share price retreated to $8.89. (*See* Wienner Report at 6, ECF #15-10 at 7, Pg. ID 437.)

6

**C**

Sherry has owned shares of Rockwell's public stock since October 2011. (*See* Compl. at ¶10, Pg. ID 5.)  On January 8, 2015, Sherry and a second Rockwell shareholder sent the Demand Letter to the Board. (*See* Demand Ltr., ECF #15-10 at 21-26, Pg. ID 451-56.)  In the Demand Letter, Sherry claimed that the granting of the Option Awards was improper for two reasons.  First, Sherry argued that the Compensation Committee had improperly timed their granting of the Option Awards in order to "take advantage of the expected stock gains that would occur after the announcement of the deal with Baxter." (*Id.* at 25, Pg. ID 456.)  He complained that:

> [t]he Compensation Committee granted [the Option Awards] just prior to the release of material information that caused Rockwell's stock price to rise, and made these grants with the intent of circumventing the shareholder-approved restriction requiring that the exercise price [of any option award] be no less than the fair market value of [Rockwell's] common stock on the date of the grant.  This practice – known as 'spring loading' – constitutes a violation of the terms and objectives of the Plan and is a breach of fiduciary duty.

(*Id.* at 23, Pg. ID 453).  Sherry contended that the timing of the Option Awards was suspicious because the Compensation Committee normally issued option awards in January and/or June, not October.  (*See id.*)

Second, Sherry argued that the Compensation Committee granted Chioini more options in one fiscal year than he was entitled to receive under the Plan:

> Section 7.3 of the Plan, as most recently approved by shareholders in May 2014, provides that during any fiscal year no individual employee may be granted awards of stock options covering more than 500,000 shares or awards of restricted stock covering more than 200,000 shares. ….
>
> On January 13, 2014, Chioini was granted 250,000 stock options and 100,000 shares of restricted stock under the Plan.  Then, on October 1, 2014, Chioini was granted 500,000 stock options and 200,000 shares of restricted stock under the Plan.  …. Accordingly, during the 2014 fiscal year, Chioini was granted a total of 750,000 stock options and 300,000 shares of restricted stock under the Plan, exceeding the [l]imits by 250,000 stock options and 100,000 shares of restricted stock.

(*Id.* at 25-26, Pg. ID 456-67.)

Sherry concluded the Demand Letter by insisting that the Board "rescind" the Option Awards, "seek any further appropriate relief … for damages sustained as a result of the misconduct described [in the Demand Letter]," "[i]nvestigate whether there [were] additional violations of the Plan," and "[a]dopt and implement adequate internal controls and systems … designed to prohibit and prevent a recurrence of [violations of] the Plan []." (*Id.* at 26, Pg. ID 457).

## D

Rockwell shared the Demand Letter with its outside counsel, the Dykema Gossett law firm ("Dykema").  After consulting with Dykema, Rockwell decided to seek court appointment of a disinterested person to investigate the claims made

in the Demand Letter and to determine whether the company should pursue those claims.

Section 495 of the Michigan Business Corporations Act authorized Rockwell to seek such an appointment. *See* M.C.L. § 450.1495 ("Section 495"). In relevant part, Section 495 provides that when a corporation receives a shareholder demand letter, it may file a motion asking a court to appoint a "panel of [one] or more disinterested persons" to investigate the claims asserted in the demand letter and to determine whether "the maintenance of [a] derivative proceeding is … in the best interests of the corporation." M.C.L. § 450.1495(2)(c). If a court later finds that the disinterested person has made "a determination in good faith after conducting a reasonable investigation upon which its conclusions are based that the maintenance of [a] derivative proceeding is not in the best interest of the corporation," then the court "shall dismiss" any "derivative proceeding" asserting the claims raised in the demand letter. M.C.L. § 450.1495(1). The statute assigns to a plaintiff-shareholder the "burden of proving" that that the court-appointed disinterested person's investigation was not reasonable and/or that his determination was not made in good faith. *Id.*

Rockwell concluded that Wienner would be an appropriate "disinterested person" to conduct a Section 495 investigation into the claims asserted in the Demand Letter. Wienner is a graduate of Harvard College and the University of

Michigan Law School. (*See* ECF #1 at 59, Pg. ID 59.)  He has practiced law as a commercial litigator in the Detroit area for nearly 40 years. (*See id*.)  He began his career with the Dykema law firm in 1978. (*See id.*)  He became a partner, and later hiring partner, at Dykema, before forming the Feeney, Keller, Wienner & Bush law firm in 1992. (*See id.*)  In 2003, he formed another law firm (Wienner & Gould, P.C.) with attorney Seth Gould ("Gould"). (*See id.*)  Wienner has represented both plaintiffs and defendants in securities actions, and he was named a "2015 Best Lawyer" by the magazine *U.S. News*. (*See id.*)

In early February 2015, Dykema contacted Wienner on Rockwell's behalf and asked him if he would be interested in serving as the court-appointed disinterested person. (*See* Wienner Dep. at 12-13, ECF #32-1 at 5, Pg. ID 800.) After Dykema explained the general nature of the claims in the Demand Letter, Wienner agreed to serve as a disinterested person under Section 495. (*See id.*)

Rockwell thereafter filed a petition in the OCCC formally seeking Wienner's appointment (the "Petition").  (*See* ECF #1 at 44-60, Pg. ID 44-60.) Rockwell captioned the Petition "In re Appointment of Disinterested Person as to Rockwell Medical, Inc." (*Id*.)  The Petition did not identify any party other than Rockwell, nor did it indicate that it had been served on any other party. (*See id.*)

The Petition was assigned to Circuit Court Judge Wendy Potts ("Judge Potts"), one of two judges on OCCC's Business Court division. (*See id.*)  Judge

10

Potts has served as an OCCC Judge since 1997, was chief judge of that court from 2004-2009, and has been a member of the Business Court since 2013. *See* Honorable Wendy Potts Biography, *available at* https://www.oakgov.com/courts /circuit/Pages/judges/potts-wendy-pro.aspx.

In the Petition, Rockwell explained that it had recently received the Demand Letter, and it "request[ed] that the [c]ourt appoint S. Thomas Wienner to investigate" the claims made in the letter. (ECF #1 at 45, Pg. ID 45.) The Petition outlined Wienner's qualifications and noted that "no claim is asserted against him in the demand letter." (*Id.* at 45-46, Pg. ID 45-46.) Rockwell attached three exhibits to the Petition: (1) the Demand Letter (*see id.* at 50-55, Pg. ID 50-55), (2) an affidavit from Wienner in which he averred that that Rockwell was not a client of his (or his law firm) and that he had "no interest in Rockwell or the transactions put at issue" in the Demand Letter (*id.* at 57, Pg. ID 57), and (3) biographical information about Wienner (*see id.* at 59, Pg. ID 59). Wienner's attached biography disclosed that had previously worked at Dykema (the same firm that represented Rockwell in the Petition), rose to partner at that firm, helped form the Feeney Kellet firm, and finally started his own firm. (*See id.*) Three weeks later, on March 6, 2015, Judge Potts entered a written order appointing Wienner "as a disinterested person pursuant to M.C.L. 540.1495(2)(c)." (*Id.* at 61, Pg. ID 61.)

11

**E**

Wienner commenced his investigation shortly after his appointment. Wienner spent "in the neighborhood of 40 [to] 50 hours" investigating the claims in the Demand Letter. (Wienner Dep. at 14, ECF #32-1 at 6, Pg. ID 801.)  Among other things, Wienner:

- Read and "[c]arefully considered" the claims made in the Demand Letter, the reasoning and support for those claims, and the case law cited in the Demand Letter. (*Id.* at 52-53, 126, ECF #32-1 at 15, 34, Pg. ID 810, 829);

- Conducted legal research into the nature of the legal claims raised in the Demand Letter, and reviewed additional research that Gould conducted. (*See id.* at 15-17, 51, ECF #32-1 at 6, 15, Pg. ID 801, 810);

- Reviewed "many analyses" of Rockwell's stock price both before and after the announcement of the Baxter transaction. (*Id.* at 118, ECF #32-1 at 32, Pg. ID 827);

- Reviewed documents related to the Baxter transaction and to the Compensation Committee's decision to grant the Option Awards, including the Plan, the 2014 Proxy Statement, e-mails, and minutes of meetings of the Board and the Compensation Committee. (*See id.* at 44-49, ECF #32-1 at 13-14, Pg. ID 808-09);

- Interviewed everyone at Rockwell who participated in (1) the negotiation of the Baxter transaction and the decision to approve that transaction and (2) the granting of the Option Awards. He interviewed Chioini and Klema (Rockwell's Vice President and Chief Financial Officer) in person, and he interviewed the three outside

12

directors and members of the Compensation Committee – Bagley, Boyd, and Holt – by phone. (*See id.* at 49, ECF #32-1 at 14, Pg. ID 809); and

- Asked each of the individuals he interviewed for documents and/or e-mails related to the issues raised in the Demand Letter.[1]

On March 31, 2015, Wienner submitted an 18-page report to the Board (the "Wienner Report"). (*See* ECF #15-10.)  The Wienner Report included 76 pages of exhibits. (*See id.*)  The Wienner Report analyzed the allegations in the Demand Letter and assessed whether Rockwell should pursue claims based upon those allegations.

Wienner first found fault with Sherry's assertion that the Board spring-loaded the Option Awards.  Wienner concluded that the "factual underpinnings" of that claim were "seriously undermined" by a number of factors. (*Id.* at 12, ECF #15-10 at 13, Pg. ID 443.)  For example, Wienner noted that the vesting period for the Option Awards cut against Sherry's claim that they had been spring-loaded to take advantage of a rise in Rockwell's share price due to the announcement of the

---

[1] Some of Wienner's deposition testimony could perhaps create the impression that Wienner did not ask all of the individuals he interviewed to provide him with e-mails or notes.  However, during the September 20, 2016, hearing before the Court, Wienner testified that he did ask all of the individuals he interviewed to provide him with relevant e-mails.  The Court credits Wienner's testimony at the hearing because it found Wienner to be an entirely credible witness, and the Court concludes that Wienner did ask all of the witnesses he interviewed to provide him with e-mails.  The Court also credits Wienner's testimony at the hearing that he asked the witnesses for notes related to the Baxter transaction and the Option Awards.

Baxter transaction.  Wienner explained that the recipients of the Option Awards could not exercise the first portion of the options until a full year after they were issued and had to wait three years to finally exercise the last of them. (*See id.*) Thus, Wienner concluded that the Option Awards were not timed to take advantage of a possible surge in Rockwell's price immediately following of the announcement of the Baxter transaction.

Moreover, Wienner opined that no matter how Rockwell's stock performed right after the Baxter transaction was announced, it was "absolutely impossible to predict on October 1, 2014 whether [Rockwell's] stock price would be higher or lower than the exercise price of the options by the time the options vested and could be exercised." (*Id.* at 13, ECF #15-10 at 14, Pg. ID 444.)  In Wienner's opinion, the FDA's consideration of Triferic at that same time made predicting Rockwell's future share price especially difficult and undercut Sherry's spring-loading theory.   Wienner observed that if the FDA approved Triferic and eventually licensed it for sale commercially, Rockwell's stock price would have risen substantially. (*See id.*)   Conversely, "[i]f the [FDA] had recommended against approval of Triferic or suggested that additional studies were necessary … which were very real possibilities, then the fair market value of [Rockwell's] stock could be expected to fall dramatically." (*Id.*)  Based on this uncertainty, Wienner determined that "if the Compensation Committee wanted to grant spring-loaded

options in order to give themselves an illicit gain, then October 2014 would not have been a good time to do it." (*Id.* at 13-14, ECF #15-10 at 14-15, Pg. ID 444-45.)

Finally, Wienner concluded that Sherry's spring-loading theory overstated the potential impact of the Baxter transaction on Rockwell's long-term stock price. Wienner determined that the potential Triferic approval, not the Baxter transaction, had, by far, the greatest potential to positively impact Rockwell's stock price, and Wienner thus opined that it did not make sense to conclude that the Compensation Committee would have spring-loaded the options based on the Baxter transaction. In Wienner's words, "[t]o suggest that the prospective Baxter deal was remotely as important as Triferic for the future of Rockwell and the value of its stock is to believe that the tail wags the dog." (*Id.* at 14, ECF #15-10 at 15, Pg. ID 445.)

Wienner next analyzed Sherry's allegation that the Compensation Committee granted Chioini more options in a fiscal year than he was entitled to receiver under the Plan. (*See id.* at 15-18, ECF #15-10 at 16-19, Pg. ID 446-49.) Wienner determined that Rockwell should not pursue this claim. Wienner explained that the Plan was "ambiguous" with respect to whether its caps on option awards applied to all options or only to certain types of options awarded under a specific section of the Tax Code known as "Section 162(m)." (*Id.* at 17-18, ECF #15-10 at 18-19, Pg. ID 448-49.) Wienner then concluded that the Compensation

Committee "acted properly and well within its authority" when it interpreted this ambiguous language to allow it to award Chioini additional options in excess of the Plan's limits so long as those additional options were not Section 162(m) options. Because this "interpretation [of the Plan] was entirely reasonable," Wienner recommended that Rockwell not pursue any claims related to Chioini's option award. (*Id.*)

Rockwell adhered to Wienner's determination and did not pursue any claims based upon the allegations in the Demand Letter. On April 3, 2015, Rockwell sent notice to Sherry's counsel that it had "determined that maintenance of a derivative proceeding is not in the best interest of the corporation." (ECF #1 at 41, Pg. ID 41.)

**F**

On December 1, 2015, Sherry filed this shareholder derivative action. (*See* Compl., ECF #1.) As described above, Sherry brought this action against seven Defendants: the four members of the Board (Chioini, Bagley, Boyd, and Holt) and three corporate officers of Rockwell (Klema, Gupta, and Pratt). (*See id.*) Sherry named Rockwell as a "nominal" Defendant. (*See id.*)

In the Complaint, Sherry purports to bring three "derivative" claims on behalf of Rockwell and one "direct" claim on behalf of Rockwell's shareholders. In the three derivative claims, Sherry alleges that the Defendants breached their fiduciary duties (Count I), were unjustly enriched (Count III), and committed

16

corporate waste (count IV)[2] when they awarded and/or accepted (1) "spring loaded" stock options and/or (2) more options in one fiscal year than the Plan allowed.  In his "direct" claim (Count III), Sherry alleges that the Defendants "breached their fiduciary duty by filing and seeking shareholder action on the basis of the materially false and misleading 2014 Proxy [Statement]." (*Id.* at ¶84, Pg. ID 27.)  Sherry did not previously raise this "direct" claim in the Demand Letter, and Wienner did not investigate it or make any determination with respect to it.

Sherry acknowledges in the Complaint that the OCCC appointed Wienner to investigate the allegations made in the Demand Letter and that Wienner determined that Rockwell should not pursue any claims based on those accusations. (*See id.* at ¶¶ 44-45, Pg. ID 16.)  But Sherry also alleges that Wienner's investigation "was not performed in a good faith and reasonable manner, and did not properly or adequately respond to the concerns expressed in the Demand [Letter]." (*Id.* at ¶46, Pg. ID 16-17.)  The Complaint does not contain any specific factual allegations concerning precisely how Wienner's investigation was unreasonable or why his determination was not made in good faith.

On February 2, 2016, the Defendants (including Rockwell) moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure for the entry of an order dismissing the Complaint (the "Motion"). (*See* ECF #15.)  Defendants argued that

---

[2] Count IV of the Complaint is brought against the Compensation Committee members (Defendants Boyd, Holt, and Bagley) only.

Section 495 required the court to dismiss the derivative claims because Wienner had determined that "the maintenance of [a] derivative proceeding [was] not in best interests" of Rockwell. (*See id.*)  Defendants also argued, among other things, that Sherry's purported "direct" claim was, in fact, a derivative claim, and that Sherry lacked standing to bring that claim. (*See id.*)  Sherry opposed the Motion. (*See* Resp. Br., ECF #17.) The Court held two hearings on the Motion: one on May 27, 2016 and another on September 20, 2016. (*See* Dkt.)

## II

### A

At this point in a typical Opinion and Order on a motion – after stating the relevant facts and procedural background – the Court customarily sets forth the procedural framework for deciding the motion.  In most cases this is a simple exercise that involves reciting well-established rules.  For instance, if the motion is one to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court draws upon the *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), line of cases, considers the allegations in the complaint, treats them as true, and grants relief if the allegations fail to state a plausible claim for relief.  Likewise, if the motion is one for summary judgment under Rule 56(a), the Court draws upon the *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), line of cases, considers all of the evidence in the record, views that

evidence in the light most favorable to the non-moving party, and grants relief when there is no genuine dispute as to any material fact. But it is no easy task to decide which procedural framework to apply when a party moves under Section 495 to dismiss a derivative action based upon a determination by a court-appointed disinterested person.[3]

This type of motion "is a hybrid that does not have a clear analogue under the Federal Rules of Civil Procedure." *Booth Family Trust v. Jeffries*, 640 F.3d 134, 139 (6th Cir. 2011) (describing a similar motion available under Delaware law[4]). It has "some characteristics of a motion to dismiss pursuant to Rule 12, and some characteristics of a motion for summary judgment under Rule 56." *Id.* And some of its characteristics do not fit within either Rule 12 or Rule 56. Moreover, there is no on-point, controlling authority that establishes the procedural

---

[3] When the Court references a motion under "Section 495" in this Opinion and Order, it is specifically referring to a motion to dismiss a derivative action based upon a determination made by "a panel of 1 or more disinterested persons appointed by the court upon motion by the corporation." M.C.L. § 450.495(2)(c).

[4] Motions to dismiss shareholder derivative suits under Delaware law have certain similarities to motions to dismiss such suits under Section 495. For instance, under both Section 495 and Delaware law, courts consider whether an investigation was procedurally reasonable and whether the investigator acted in good faith. However, there is at least one important difference between Delaware law and Section 495. Under Delaware law, courts also examine whether the substantive conclusion reached by the investigator was reasonable. *See, e.g.*, *Zapata Corp v. Maldonado*, 430 A.2d 779, 788-89 (Del. 1981). In sharp contrast, under Section 495, a court is *not* "permitted to evaluate the reasonableness of a [disinterested person's] conclusion." *Virginia Damon Trust v. North Country Fin. Corp.*, 406 F.Supp.2d 796, 800 (W.D. Mich. 2005).

19

framework to apply when a corporation moves under Section 495 to dismiss a derivative claim based upon the determination of a court-appointed disinterested person.

The text of Section 495 does not clearly dictate which procedural framework to apply; instead, it offers mixed signals on procedural matters.[5]  The statute directs a court to "dismiss" a derivative proceeding under certain circumstances, and the notion of "dismissing" a deficient claim is most commonly associated with the Rule 12(b)(6) framework. *See, e.g.*, *Rose v. Hartford Underwriters Ins Co.*, 203

---

[5] In relevant part, Section 495 provides:

> (1) The court shall dismiss a derivative proceeding if, on motion by the corporation, the court finds that 1 of the groups specified in subsection (2) has made a determination in good faith after conducting a reasonable investigation upon which its conclusions are based that the maintenance of the derivative proceeding is not in the best interests of the corporation.  If the determination is made pursuant to subsection (2)(a) or (b), the corporation shall have the burden of proving the good faith of the group making the determination and the reasonableness of the investigation.  If the determination is made pursuant to subsection (2)(c) or (d), the plaintiff shall have the burden of proving that the determination was not made in good faith or that the investigation was not reasonable.
>
> (2) A determination under subsection (1) may be made by any 1 of the following:
>
> [….]
>
> (c) By a panel of 1 or more disinterested persons appointed by the court upon motion by the corporation.

M.C.L § 450.1495(1) and (2)(c).

F.3d 417, 420-21 (6th Cir. 2000) (referring to a motion filed under "Rule 12(b)(6)" as a "motion to dismiss").  However, the statute also directs a court to make a "find[ing]," and courts commonly make "findings" based upon an evidentiary record, not mere allegations in a complaint. *See, e.g. Deal v. Hamilton County Bd. of Educ*, 392 F.3d 840, 850-51 (6th Cir. 2004) (explaining that in certain cases, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record").  Moreover, the statute's reference to the burden of proof further suggests that a court must weigh and consider record evidence, not mere allegations in a complaint.

The Court has not found any reported decision that sheds substantial light on the procedural framework to be applied to a Section 495 dismissal motion based upon a court-appointed disinterested person's determination.  In the only reported decision in which a court has actually ruled on such a motion – *Virginia Damon Trust v. North Country Fin. Corp*., 406 F.Supp.2d 796 (W.D. Mich. 2005) – the court did not specify whether it was treating the motion as one under Rule 12(b)(6) or Rule 56 (or as some sort of hybrid motion).  Nor did that court evaluate whether the disinterested person conducted a reasonable investigation or reached his determination in good faith.[6]  Dicta in another decision (not involving a motion

---

[6] The shareholder-plaintiff in *Virginia Damon Trust* opposed the motion to dismiss on the ground that the determination of the disinterested person was substantively unreasonable. *See Virginia Damon Trust*, 406 F.Supp.2d at 800-01.  The court held

21

under Section 495) suggests that a motion under Section 495 may be brought *either* as "a motion to dismiss" *or* as one "for summary judgment." *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 951 F.Supp. 679, 692 n. 1 (W.D. Mich. 1996).[7] And while eight other states have statutes that authorize a court to dismiss a derivative action based upon a determination by a court-appointed disinterested person, *see* Deborah A. DeMott and David F. Cavers, *Shareholder Deriv. Actions L. & Prac*. § 5:17 (2016-17) at n. 16 (identifying statutes), the Court has not found any reported decision that establishes the procedural framework to apply to a motion seeking dismissal on that basis. Judicial decisions on this issue are lacking because "the 'disinterested person' procedure, employing individuals who are not directors, is in its infancy." *Id.*

The Sixth Circuit has addressed the procedural framework to be applied to analogous motions. In *Hasan v. CleveTrust Realty Investors*, 729 F.2d 372 (6th Cir. 1984), the Sixth Circuit held that a motion under Massachusetts law to

that Section 495 did not permit a substantive attack on the disinterested person's determination and granted the corporation's motion to dismiss because the shareholder-plaintiff had not offered any permissible grounds of opposition to the motion. *See id.*

[7] This dicta further notes that Section 495 "does not totally dispose of all factual issues." *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 951 F. Supp. at 692 n. 1. The court said that the "factual issues" existing under Section 495 include whether the disinterested person conducted a reasonable investigation and acted in good faith. *Id.* The court suggested that in light of these factual issues, corporations "that intend to rely on [Section 495] may wish to withhold filing a motion to dismiss and … file a motion for summary judgment" after discovery concerning the disinterested person's investigation. *Id.*

terminate a derivative proceeding based upon a special litigation committee's recommendation should be treated as one for summary judgment under Rule 56. And, as noted above, in *Booth Family Trust*, 640 F.3d at 139, the Sixth Circuit said that a motion under Delaware law to terminate a derivative proceeding based upon a special litigation committee's recommendation has traits of both a motion to dismiss and one for summary judgment but "is most similar to a summary judgment motion."

As this survey of the relevant case law reveals, the Court sets out on territory that is largely uncharted as it attempts to determine the appropriate procedural framework for a motion to dismiss under Section 495 based upon a court-appointed disinterested person's determination.

## B

The Defendants argue that the Court should treat their motion under Section 495 as one to dismiss under Rule 12(b)(6). (*See* Def.'s Mot. for Summ. J. at 9, ECF #15 at 21, Pg. ID 117.)  They contend that the "summary judgment standards of [Rule 56] do not apply to a motion to dismiss derivative litigation" under Section 495, and they urge the Court to decide the Motion based solely upon the allegations in the Complaint, without permitting discovery and without considering any outside evidence. (Def.'s Reply Br. at 1-3, ECF #19 at 2-4, Pg. ID 618-20.) Sherry counters that the Court should allow him to develop an evidentiary record

on which to base his opposition to the motion and that the Court should consider the Motion "under the summary judgment standards of [Rule] 56, not the pleading standards of [Rule] 12(b)(6)." (Sherry Resp. Br., ECF #17 at 11, ECF #17 at 20, Pg. ID 558; internal quotation marks omitted.)   The Court concludes that the Motion cannot properly be resolved under either framework.

Strictly applying the Rule 12(b)(6) framework to a motion under Section 495 could too often make it virtually impossible for a shareholder-plaintiff to pursue a derivative claim that a court-appointed disinterested person has recommended against.  As noted above, a motion under Rule 12(b)(6) tests the sufficiency of the allegations in a complaint, and the motion is decided before (and without) discovery. *See, e.g.*, *Kolley v. Adult Protective Services*, 725 F.3d 581, 586 (6th Cir. 2013) ("A plaintiff is not entitled to discovery before a motion to dismiss, and dismissal under Rule 12(b)(6) helps protect defendants from expending resources on costly discovery for cases that will not survive summary judgment").  But without discovery, it may well be impossible for a shareholder-plaintiff to plead facts showing that a disinterested person failed to conduct a reasonable investigation and/or made a determination in bad faith.  This difficulty stems from the facts that (1) the disinterested person's investigation and determination may often occur outside the purview of the shareholder-plaintiff and (2) the disinterested person's report, if made available to the shareholder, may leave

unanswered many questions concerning the scope of the investigation and how the disinterested person's final determination was made.[8]   In light of this difficulty, courts have allowed derivative plaintiffs to conduct limited discovery where a corporation moves to dismiss a derivative suit based upon the recommendation of a person or body that has investigated the claims.   *See* 2 *McLaughlin on Class Actions* § 9:20 (13th ed.) at n. 7 (collecting cases).[9]   Because the Rule 12(b)(6)

---

[8] That is what happened here.  Sherry insists (and Defendants do not contest) that he did not find out that Wienner had been appointed or that Wienner was analyzing the claims raised in the Demand Letter until Wienner had completed his investigation and finalized the Wienner Report.  And while the Wienner Report was thorough and carefully-drafted, it left open some fair questions concerning Wienner's investigation.  For instance, the Wienner Report noted that Wienner reviewed "relevant background documents," (Wienner Report at 3, ECF #15-10 at 4, Pg. ID 434), but it did not identify all of the documents Wienner deemed "relevant" and reviewed.  Nor did the Wienner Report say that Wienner reviewed "all" relevant documents.  Moreover, the Wienner Report did not specifically indicate whether Wienner reviewed any e-mails, telephone records, correspondence, or calendar entries related to the Baxter transaction or the Option Awards.  Nor did the Wienner Report describe how Wienner determined whom to interview or why he did not interview any additional individuals who may have had information relevant to his investigation.  Finally, the Wienner Report did not explain why Wienner did not communicate with Sherry or his counsel before finalizing his investigation.   Wienner later answered these questions during discovery and in testimony before the Court.

[9] *See also Scalisi v. Grills*, 501 F.Supp.2d 356, 360 (E.D.N.Y. 2007) (noting that court had allowed derivative plaintiffs "to conduct limited discovery into the nature and scope of the Committee's investigation"); *Strougo on Behalf of Brazil Fund, Inc. v. Padegs*, 1 F.Supp.2d 276, 282 (S.D.N.Y. 1998) (allowing derivative plaintiff to "(1) inspect the thirty boxes and any other documents made available to the [special litigation committee], (2) inspect the notes of interviews and drafts of the [committee's] [r]eport; and (3) depose the members of the [committee]"); *Zapata*, 430 A.2d at 788 (holding that limited discovery is appropriate with respect

framework does not allow for this often-essential limited discovery, the Court declines to apply that framework to a motion under Section 495.

Applying the Rule 56 framework to a motion under Section 495 would create a different problem: it would too often deprive corporations of the protections that the Michigan Legislature (the "Legislature") intended to provide them under the statute. More specifically, a primary purpose of Section 495 is "to save a corporation the aggravation and expense of defending a meritless derivative case," *Picard Chem. Inc. Profit Sharing Plan*, 951 F.Supp. at 692 n. 1,[10] and strictly applying the Rule 56 framework would undermine that purpose. Under the Rule 56 framework, a court may not resolve factual disputes and may not grant relief in the face of any material factual disputes. *See, e.g.*, *Alman v. Reed*, 703 F.3d 887, (6th Cir. 2013) ("[i]n reviewing the record at the summary-judgment stage, [courts] must not … resolve material factual disputes"). Thus, if a court were to apply that framework to a motion under Section 495, it would have to deny

---

to "the independence and good faith of the committee and the bases supporting its conclusions").

[10] *See also Virginia M. Damon Trust*, 406 F.Supp.2d at 801 (explaining that the purpose of Section 495 is "to save the corporation money in defending or prosecuting a weak case originally brought as a derivative claim and to give the corporation the incentive to take the case if the derivative claims have merit"); Stephen H. Schulman, Cyril Moscow, and Margo Rogers Lesser, *Michigan Corporation Law and Practice* § 4.26 (2014 Supp.) ("Dismissal needs to be available to protect the corporation and its officials from the expense and distraction of pointless, unmeritorious litigation. Even if the litigation is not frivolous, its costs may exceed its potential benefits, and termination is justified").

the motion and hold "a trial on the merits of [the shareholders] substantive allegations" whenever there was a material factual dispute as to the reasonableness of a disinterested person's investigation or as to his good faith. *See Hasan*, 729 F.2d at 380 (remanding for trial on merits of substantive claims after finding question of fact as to special litigation committee's good faith and thoroughness).[11] But the Legislature did not intend to force corporations to litigate the merits of derivative claims where there is merely a question of fact concerning a disinterested person's reasonableness or good faith.   On the contrary, the Legislature intended to require such litigation only where a shareholder carried his ultimate "burden of proving" that the court-appointed disinterested person's investigation was unreasonable or that his determination was not made in good faith. M.C.L. § 450.1495(1).   In order to achieve the Legislature's intent, a court must decide issues related to a disinterested person's investigation and determination – and resolve factual disputes concerning those issues – *before* allowing a shareholder to litigate the merits of his claims.   This cannot be done within the traditional Rule 56 framework.

Moreover, the Rule 56 framework generally allows for reasonably comprehensive discovery before any decision on the motion.   But allowing such

---

[11] *See also Booth Family Trust*, 640 F.3d at 140 n.2 (explaining that if there is a question of fact concerning a special litigation committee's good faith or reasonableness, then a court should allow "the shareholder plaintiffs' claims to proceed to their merits").

discovery would frustrate Section 495's goal of freeing the corporation from having to devote substantial resources to claims that a disinterested person has recommended against pursuing. This further persuades the Court not to apply the traditional Rule 56 framework to a motion under Section 495.

The Court concludes that in order to achieve the Legislature's intent in enacting Section 495, a motion to dismiss a derivative action based upon a court-appointed disinterested person's determination must be addressed as follows. First, if, at the time the motion is filed, the shareholder lacks a reasonable amount of information concerning the disinterested person's investigation – because it was conducted outside of the shareholder's purview, because the disinterested person's report omits important details about the investigation, or for any other reason – then a court should permit the shareholder to take some limited discovery before ruling on the motion. The subject-matter of this discovery should be restricted to the reasonableness of the investigation and whether the disinterested person's determination was made in good faith; it should not touch upon the merits of the shareholder's substantive allegations. *See* Stephen H. Schulman, Cyril Moscow, and Margo Rogers Lesser, *Michigan Corporation Law and Practice* § 4.27 (2014 Supp.) ("At most, [under Section 495], only limited discovery should be allowed by the court to test good faith and reasonableness of investigation"). Moreover, the amount of such discovery should be limited. Allowing the shareholder-plaintiff to

28

depose the disinterested person about his investigation and to review the materials that the disinterested person reviewed may be sufficient to allow the plaintiff to meaningfully challenge the investigation under Section 495.

Second, if the discovery reveals (1) the presence of factual disputes related to the reasonableness and/or good faith issues or (2) the need for a court to resolve credibility disputes, the court should hold an evidentiary hearing and resolve those disputes. *See Klein ex rel. Klein v. FPL Group, Inc.*, 2004 WL 302292 at *17 (S.D. Fla. 2004) (holding under analogous Florida statute that if "the court finds that there are material questions of fact, or there is a need for credibility determinations … the court should hold an evidentiary hearing on the material issue of fact in dispute, and determine matters of credibility, in order to decide whether … to dismiss the derivative proceeding").[12]

Third, the court should make a final ruling as to whether the shareholder has carried his "burden of proving" that the court-appointed disinterested person's investigation was not reasonable or that his determination was not made in good

---

[12] *See also Houle v. Low*, 556 N.E.2d 51, 59 (Mass. 1990) (directing that issue of whether special litigation committee acted in good faith be resolved following "an evidentiary hearing before a judge without a jury to determine whether the committee was independent and unbiased"); *Cuker v. Mikalauskas*, 692 A.2d 1042, 1048 (Pa. 1997) (authorizing trial courts to "order limited discovery or an evidentiary hearing to resolve issues pertaining to [a] board's decision" not to pursue a derivative claim); *Day v. Stascavage*, 251 P.3d 1225, 1229 (Colo. App. 2010) (explaining that "[a]ny factual disputes [concerning a special litigation committee's 'independence and investigation' must be resolved by a court after an evidentiary hearing").

faith. M.C.L. § 450.1495(1). If the shareholder satisfies his burden on either of these points, then the court should permit the shareholder to litigate the merits of his claims; if not, the court should dismiss the claims and enter judgment against the shareholder.

The Court applied this framework in this case. The Court first concluded, for the reasons stated in footnote eight above, that Sherry did not have sufficient information to reasonably challenge Wienner's investigation and good faith. It therefore allowed Sherry to take some limited discovery with respect to those issues. Specifically, the Court permitted Sherry (1) to depose Wienner regarding his investigation and his relationships with Dykema (Rockwell's lawyers) and (2) to review all of the available documents that Wienner reviewed during his investigation.[13] The Court then allowed the parties to file supplemental briefs – based upon the factual record developed during this limited discovery – addressing whether Wienner's investigation was reasonable and whether his determination was made in good faith. (*See* ECF ## 32, 34.) Finally, at Defendants' request, with no objection from Sherry, during the second hearing on the Motion, the Court

---

[13] Wienner testified at his deposition that he no longer possessed some documents that he reviewed or created during his investigation, such as some handwritten notes and draft copies of his report. (*See* Wienner Dep. at 16-17, ECF #15-10 at 6, Pg. ID 801.)

heard live testimony from Wienner concerning certain aspects of his investigation and determination.[14]

### III

Sherry has not satisfied his burden under Section 495 to establish that Wienner's investigation was unreasonable and/or that Wienner's determination was not made in good faith.[15]

### A

Courts have offered various tests for assessing the reasonableness of an investigation into a shareholder demand. This Court has said that an investigation is unreasonable only where it is "'so restricted and so shallow in execution, or otherwise 'so pro forma and half-hearted' as to constitute a pretext or sham.'" *In re Consumers Power Co. Derivative Litigation*, 132 F.R.D. 455, 483 (E.D. Mich. 1990) (quoting *Auerbach v. Bennett*, 393 N.E.2d 994, 1003 (N.Y. Ct. App. 1979)). Other decisions instruct that courts "must examine the methodologies and

---

[14] When the Defendants proposed to present testimony from Wienner, counsel for Sherry indicated that he may have objections to some of the anticipated testimony. Counsel then agreed to assert specific objections (if he ended up having any) as the testimony proceeded. Counsel did not end up objecting to any of the testimony.

[15] In his supplemental brief, Sherry argued that "the Court is not in possession of sufficient evidence to find that the Wienner investigation was reasonably conducted in good faith under [Section 495]." (Sherry Supp. Br. at 3, ECF #35 at 6, Pg. ID 1081.) But, as Sherry's counsel candidly acknowledged at the September 20, 2016, hearing, Section 495 places the burden *on Sherry* to establish that Wienner's investigation was *not* reasonable or that his determination was *not* made in good faith. *See* M.C.L. § 450.1495(1).

procedures of" the investigation in order to "to determine whether [the investigation] contains any procedural irregularities that suggest unreasonableness." *Seidi v. American Century Companies, Inc.*, 799 F.3d 983, 992 (8th Cir. 2015). This line of cases (which has arisen largely in the context of investigations by special litigation committees[16]) directs courts to focus on the following factors when determining whether an investigation was reasonable:

> (1) whether the committee engaged independent counsel to assist in the investigation; (2) whether the committee produced a report, its length, and whether the report documented the committee's procedures, reasoning, and conclusions; (3) whether the committee interviewed and reviewed the testimony of relevant directors, officers, and employees; (4) whether the committee or its counsel reviewed documents relevant to the questionable transaction; and (5) the number of times the committee met.

*Id.*; *see also Scalisi v. Grills*, 501 F.Supp.2d 356, 363 (E.D.N.Y. 2007) (citing *Bender v. Schwartz*, 917 A.2d 142 (Md. App. 2007) (reciting and applying same factors); *Witchko v. Schorsch*, 2016 WL 3887289, at *6 (S.D.N.Y. June 9, 2016) (reciting and applying same factors).

This much is clear: a disinterested person "is not required to undertake the ideal or perfect investigation – one that can anticipate all suggestions and withstand any criticism of derivative plaintiffs or of future court review. What is

---

[16] The Court looks to cases assessing the reasonableness of special committee investigations because the Court has found no case assessing the reasonableness of an investigation by a court-appointed disinterested person.

required is that the [disinterested person] makes a reasonable effort to reach an informed business decision." *In re Consumers Power*, 132 F.R.D. at 483 (reviewing the reasonableness of a corporate advisory committee's investigation). And what is reasonable "turn[s] on the nature and characteristics of the particular subject being investigated." *Auerbach*, 393 N.E.2d at 1003.

Sherry has not persuaded the Court that Wienner's investigation was unreasonable under any of the tests set forth above. The investigation was plainly not "so restricted in scope, so shallow in execution, or otherwise so pro forma or half-hearted as to constitute a pretext or sham…." *In re Consumers Power*, 132 F.R.D. at 483. On the contrary, as described in detail above, Wienner did a substantial amount of meaningful inquiry into, and analysis of, the allegations in the Demand Letter.

Moreover, Sherry has not shown that Wienner's investigation was unreasonable under the five-factor test set forth above. First, Wienner was an independent outside counsel with no connection to Rockwell. Wienner had "no interest in Rockwell or the transactions put at issue" in the Demand Letter, and Rockwell was not a client of either Wienner or his law firm. (ECF #1 at 57, Pg. ID 57). Second, Wienner produced the Wienner Report, an 18-page document that included 76 pages of exhibits. (*See* ECF #15-10.) The Wienner Report contained information about Wienner's methodology, and it set forth his reasoning and

33

conclusions. Third, Wienner interviewed all of the people involved in the challenged transactions, including all three independent directors and members of Rockwell's Compensation Committee who approved the Option Awards. Wienner also interviewed Chioini and Rockwell's Chief Financial Officer, Klema. Fourth, Wienner reviewed substantial documentation, including documents related to the Baxter transaction, numerous financial analyses of Rockwell's stock price, minutes of relevant committee meetings, and relevant e-mails. Finally, Wienner spent between 40-50 hours on his investigation (*see* Wienner Dep. at 14, ECF #32-1 at 6, Pg. ID 801), an amount that does not strike the Court as unreasonable given the limited nature of the matters he was retained to investigate (two discrete transactions that involved a total of five Rockwell officials).

Sherry counters that Wienner's investigation was unreasonable because, in Sherry's view, its scope was "extremely limited," and it did not include a thorough review of the claims raised in the Demand Letter. (Sherry Supp. Br. at 7, ECF #35 at 10, Pg. ID 1081.) More specifically, Sherry faults Wienner for "not sufficiently review[ing] contemporaneous documents" including potentially relevant e-mails, not reviewing (or even requesting) any of the Defendants' calendars, and not reviewing "any documents to confirm or refute Defendants' claim that the members of the Compensation Committee supposedly would be 'too busy' to meet on or before January 2015 – the time of year when grants [of options] were

normally awarded." (*Id.* at 10-14, ECF #35 at 13-17, Pg. ID 1084-88.)  But as noted above, Wienner did review a comprehensive set of documents and satisfied himself that there were not additional relevant e-mails or documents to review. *See* Section II(E), *supra*.  Under these circumstances, the fact Wienner did not seek additional e-mails, did not review the Defendants' calendars, and apparently did not request additional documentation related to Defendants' schedules, does not render his overall document review (or the scope of his investigation) unreasonable.[17]

Sherry also faults Wienner for interviewing only the named Defendants in this action.  (*Id.* at 14-16, ECF #35 at 17-19, Pg. ID 1088-90.)  But Wienner has explained that he chose to interview only the named Defendants because, in his reasoned opinion, nobody else played a meaningful role in the challenged transactions:

> Q:    One of the criticisms that has been leveled against you in connection with your report is that you didn't interview people beyond the named putative defendants that were identified in the demand letter.  Do you agree that that is an appropriate criticism of your report?
>
> A:    No, I do not.

---

[17] Sherry faults Wienner for taking the Defendants' word that they did not have any additional relevant e-mails.  Sherry insists that Wienner should have conducted (or had an IT person conduct) an independent search of the Defendants' e-mails. While conducting such an independent search may be a best practice, under the circumstances of this case, the absence of such a search does not render Wienner's overall investigation unreasonable.

Q:     And why is that?

A:     That is because the putative defendants include all of the people who were involved in making the decision to grant the stock options and restricted stock.  I had, in my estimation, a pretty discrete issue to investigate. It involved a decision that was made at a single meeting -- two decisions that were made at a single meeting by three people, and there were in addition to those three people, two other officers of the company who were heavily involved in the process and in the Baxter negotiations, referring of course to Mr. Klema and Mr. Chioini. So those five people obviously were critical; Chioini and Klema and the three outside directors who comprised the compensation committee.

I inquired but satisfied myself that there was no one else at the company who played a meaningful role in these decisions that were taken on October 1; no other officers, no other employees.

The meetings, the board meeting and the compensation committee meeting, were scheduled by Mr. Klema, not by staff people. There were not other employees of the company or officers of the company who were involved in the Baxter negotiations or in the decisions of the compensation committee.

So while I asked about who else there was, I was satisfied then and I am still satisfied today that there was no one else other than the five people I interviewed who had information that would have been meaningful to me in conducting my analysis.

(Wienner Dep. at 126-128, ECF #32-1 at 34, Pg. ID 829.)

The Court does not find this explanation to be unreasonable. Indeed, "in any investigation, the choice of people to interview or documents to review is one on

which reasonable minds may differ.  Inevitably, there will be potential witnesses, documents and other leads that the investigator will decide not to pursue." *Halpert Enters. v. Harrison*, 2008 WL 4585466, at *2 (2d Cir. Oct. 15, 2008).  Wienner offered an informed and rational basis for his choice of interviewees, and the Court will not second-guess his choice.[18]

Sherry further complains that Wienner conducted a portion of his interview with Chioini and Klema in a joint session.  Sherry worries that during this joint interview, (1) Chioini and Klema may have been able to coordinate their stories and (2) Klema may not have been able to speak freely about possible wrongdoing because Chioni – Klema's boss – was present.  But Wienner has explained that Chioini was out of the room for roughly half of his (Wienner's) discussion with Klema. (*See* Wienner Dep. at 82-83, ECF #32-1 at 23, Pg. ID 818.) Thus, contrary

---

[18] Sherry specifically faults Wienner for not interviewing an individual named Franz Tudor.  Mr. Tudor appeared as a "cc" recipient on at least one of the Rockwell e-mails Wienner reviewed related to the Baxter transaction.  Wienner acknowledges that during his investigation, he was not aware that Tudor had any connection to the Baxter transaction.  But in testimony before the Court, Wienner maintained that the lack of an interview with Tudor was immaterial.  Wienner testified that he has learned that Tudor was an outside consultant to Rockwell on the Baxter transaction and that Tudor's knowledge was limited to the structure and nature of that transaction.  Thus, Wienner believes that Tudor had no connection to, or knowledge concerning, the Board's decision to issue the Option Awards.  Wienner testified that given this lack of a direct connection between Tudor and the Option Awards, (1) he (Wienner) would not have sought to interview Tudor even if he had known of Tudor during his investigation and (2) the lack of an interview with Tudor does not undermine the thoroughness of his investigation.  Sherry has not persuaded the Court that Wienner's analysis of this issue is unreasonable or that the lack of an interview with Tudor renders the investigation unreasonable.

to Sherry's concern, Klema did have an opportunity to speak freely outside of Chioini's presence, and Chioini did not have an unfettered opportunity to coordinate his statement with Klema's statement because he (Chioni) was not privy to much of what Klema told Wienner.

Sherry further insists that Wienner's investigation was unreasonable because Wienner's "conclusion that the Baxter Agreement and Announcement were not material [to Rockwell's stock price] was based *solely* on his discussions with Defendants and his own beliefs." (Sherry Reply Br. at 16, ECF #35 at 19, Pg. ID 1094; emphasis added.)   Sherry faults Wienner for not "retain[ing] or even talk[ing] to a financial analyst" concerning the impact that the Baxter transaction would have upon Rockwell's stock price. (*Id.*)   But Wienner testified at his deposition (and confirmed at the hearing before the Court) that his conclusions regarding the impact of the Baxter transaction on Rockwell's share price were not based solely on his own beliefs and his discussions with the Defendants.  Wienner explained that he "read *many* analyses of the Rockwell stock" before concluding that the Baxter transaction would not have a material, long-term impact on Rockwell's stock price. (Wienner Dep. at 118, ECF #32-1 at 32, Pg. ID 827; emphasis added.)

Finally, Sherry maintains that Wienner unreasonably ignored significant evidence that the Defendants knew that the exercise price for the Option Awards

was below the true value of Rockwell's stock.  Specifically, Sherry notes that on the same day the Compensation Committee granted the Option Awards at an exercise price of $8.88 per share, the Board "approved a resolution stating that the share price for [an] upcoming public offering [of Rockwell's stock] 'shall in no event be less than $10.00 per share.'" (Sherry Supp. Br. at 17, ECF #35 at 20, Pg. ID 1095; quoting October 1, 2016, Board Resolution, ECF #35-8 at 159, Pg. ID 1701).  Sherry faults Wienner for failing to address the $10.00 per share Board resolution in his report or analysis.  However, during the hearing before the Court on September 20, 2016, Defendants' counsel offered some potentially plausible explanations as to why the $10.00 per share resolution was not essential to the analysis of Sherry's spring-loading claim and why Wienner may have reasonably chosen not to address it in the Wienner Report.  There may be additional explanations as well.

Importantly, Sherry had two different opportunities to ask Wienner why he did not address the resolution – first at Wienner's deposition and then again during Wienner's September 20, 2016, testimony before the Court – but Sherry never raised this issue with Wienner.  As a result, Sherry has no information concerning why Wienner did not address the Board's $10.00 per share resolution.  Without that information Sherry cannot show that Wienner's decision to omit the resolution form his analysis was unreasonable.  Indeed, a primary reason the Court allowed

Sherry to depose Wienner was to permit Sherry to discover and explore Wienner's actions and omissions.  Having passed up the opportunity to ask Wienner why he did not analyze the $10.00 per share resolution in the Wienner Report, Sherry is not in a position to persuade the Court that Wienner did not have a reasonable basis for choosing not to address the resolution.

**B**

Just as courts have offered various tests for assessing the reasonableness of an investigation, they have offered different standards for assessing whether a person or committee evaluating a shareholder demand acted in good faith.  Some courts, including this one, have assessed good faith by asking the same question that courts have asked when assessing the reasonableness of an investigation: namely, did the investigator conduct an inquiry that was "'so pro forma or half-hearted as to constitute a pretext or sham'"? *See Genzer v. Cunningham*, 498 F. Supp. 682, 696 (E.D. Mich. 1980) (concluding that shareholder failed to show that special litigation committee acted in bad faith because the committee's investigation "was not 'so pro forma or half-hearted as to constitute a pretext or sham'") (quoting *Auerbach*, 393 N.E.2d at 1003).  Other courts have said that an investigator acts in good faith when he performs his duties "honestly, conscientiously, fairly, and with undivided loyalty to the corporation." *Madvig v. Gaither*, 461 F.Supp.2d 398, 408 (W.D. N.C. 2006); *see also Abella v. Univ. Leaf*

40

*Tobacco Co.*, 546 F. Supp. 795, 800 (E.D. Va. 1982) (good faith inquiry looks "into the spirit and sincerity with which the investigation was conducted, rather than the reasonableness of its procedures or bases for conclusions"); Model Bus. Corp Act. § 7.44 cmt. 2 (1998) (same).  And, in a different (but related) context, the Michigan Supreme Court has defined "good faith" as encompassing "personal upright mental attitude and clear conscience" as well as an "intention to observe legal duties." *Bliss Petroleum Co. v. McNally*, 237 N.W. 53, 55 (Mich. 1931) (describing duty of good faith that a director owes to a corporation).[19]

Sherry has not convinced the Court that Wienner's determination lacked good faith under any of these tests.  As described above, Wienner conducted a meaningful investigation and performed a careful analysis, and his work was far more than a mere pretext or sham.  Moreover, in testimony before the Court, Wienner explained that (1) he took his role as a disinterested person "seriously;" (2) he would have recommended that Rockwell pursue the claims in the Demand Letter if he had concluded that doing so was in Rockwell's best interest; (3) he took Sherry's proposed claims seriously; and (4) he tried very hard to conduct his investigation and reach his conclusions in good faith.  The Court finds all of that testimony to be highly credible.  The Court is convinced that Wienner acted with a

---

[19] *See also Connolly v. People's State Bank*, 244 N.W. 500, 502 (Mich. 1932) ("The record leaves no doubt that in this transaction the bank acted honestly, and that is all the law requires to constitute good faith.")

"personal upright mental attitude and clear conscience" as well as an "intention to observe legal duties." *Bliss Petroleum Co.,* 237 N.W. at 55. The Court therefore declines to find that Wienner's determination was not made good faith.

Sherry counters that the Court should find a lack of good faith because Rockwell sought Wienner's appointment on an "*ex parte*" basis in the OCCC. (*See* Sherry Supp. Br. at 4-10, ECF #35 at 7-13, Pg. ID 1082-88.) According to Sherry, "[t]he Michigan Court Rules expressly state only a few limited instances where *ex parte* proceedings before a court are authorized" and "[a]ppointment of a disinterested person pursuant to [Section 495] is not one of [them]." (*Id.* at 4-5, ECF #35 at 7-8, Pg. ID 1082-83.) Sherry complains that the *ex parte* nature of the appointment proceedings "precluded any adversarial opportunity for [Sherry] to vet or review Mr. Wienner's 'disinterested' credentials with the [OCCC] before his appointment." (*Id.* at 6, ECF #35 at 9, Pg. ID 1084.) Sherry insists that if he had been named as a party in the Petition, he would have been able to demonstrate to Judge Potts that because of Wienner's connections to the Dykema firm, Wienner was not truly disinterested and could not make any determinations in good faith.

The Court concludes that this line of argument is misplaced. Section 495 does not authorize this Court to review the process through which Wienner was appointed. The sole questions this Court may consider when ruling on a motion to dismiss Section 495 are: did Wienner conduct a reasonable investigation and was

his determination made in good faith?  The Court may not entertain a collateral attack on the state court's appointment of Wienner.  And even if the Court could consider the appointment proceedings, *Rockwell's* conduct during those proceedings says nothing about whether, once those proceedings concluded, *Wienner* later rendered a good faith determination.

Moreover, there was nothing improper with the manner in which Rockwell sought Wienner's appointment.  As Sherry acknowledges, Section 495 "is silent as to whether such an application may be made on an *ex parte* basis" (Sherry Supp. Br. at 4, ECF #35 at 7, Pg. ID 1082), and no provision of the Michigan Court Rules specifically requires a corporation to name any other parties to a petition for appointment of a disinterested person under Section 495.[20]  Had the Petition been procedurally improper, Judge Potts, an experienced Business Court judge who was presumably familiar with the pleading requirements of the Michigan Court Rules, surely would have declined to act on it.

In addition, the Petition *did* disclose Wienner's prior relationship with Dykema – indeed, it attached biographical information that touted Wienner's accomplishments at Dykema – and his past professional affiliation with James Feeney and Peter Kellett, two current Dykema senior partners. (*See* ECF #1 at 59,

---

[20] Since no provision of Michigan law states that any person or entity other than the moving corporation should be named as a "party" to a petition seeking the appointment of a disinterested person under Section 495, Sherry's use of the term "*ex parte*" appears misplaced.  That term implies the absence of a proper party.

Pg. ID 59.)   Thus, even without Sherry's participation, Judge Potts had an opportunity to consider Wienner's ties to Dykema when deciding whether he was disinterested.[21]

Nor is the Court is convinced that if Sherry had participated in the appointment proceedings, he could have shown that Wienner had a conflict of interest that would have undermined his ability to serve as a disinterested person. Sherry had the opportunity in *these* proceedings to develop support for his contention that Wienner's ties to the Dykema firm precluded him from making his determination in good faith, but Sherry failed to make that showing.  The evidence before the Court on this point – Wienner's deposition and hearing testimony – establishes that he does not maintain close personal ties to current Dykema attorneys, that referrals from Dykema have never been a statistically significantly part of his practice, and that his income would not be materially affected if he never received another referral from Dykema.  Wienner also testified before the

---

[21] The record contains evidence that the Business Court Judges on the OCCC are able to – and do – fairly and adequately assess a proposed disinterested person even where the shareholder is not included in the appointment proceedings.  In April 2016, Rockwell (again through its attorneys at Dykema) sought to have the OCCC appoint Wienner as a disinterested person under Section 495 "in connection with another stockholder demand letter." (Sherry Supp. Br. at 9, ECF #35 at 12, Pg. ID 1083.)  But the OCCC "declined to appoint Mr. Wienner," in part because it had previously appointed him as a disinterested person to investigate the allegations in the Demand Letter. (*Id.*)  The OCCC's refusal to re-appoint Wienner in this second derivative action indicates that that court is carefully screening petitions to appoint disinterested persons under Section 495 and not just "rubber stamping" a corporation's choice of investigator.

Court that his past ties to Dykema did not influence the conclusions in the Wienner Report. The Court found Wienner's live testimony on these points to be credible. The Court does not believe that Wienner's prior connections to Dykema disqualified him from serving as a disinterested person or that they undermined the good faith of his determination that Rockwell should not pursue the claims in the Demand Letter.

Finally, Sherry argues that Wienner could not have reached his determination in good faith because Wienner "kept [Sherry] in the dark until [] Wienner had already performed his investigation and arrived at his conclusion, ensuring that [Sherry] could not provide any input to [] Wienner" during the investigation. (Sherry Supp. Br. at 8, ECF #35 at 11, Pg. ID 1082.) But Sherry has not identified any authority to support the proposition that Wienner had a duty to confer with Sherry during his investigation or that his failure to so confer is evidence of bad faith. Moreover, Wienner testified that he "read and reread" the Demand Letter and believed that conferring with Sherry was unnecessary because he "didn't think [Sherry] or [Sherry's] counsel would have any greater insight into th[e] issues" he was investigating. (Wienner Dep. at 125-26, ECF #32-1 at 33-34, Pg. ID 828-29.) Wienner believed that the Demand Letter "laid out [Sherry's] case as persuasively as [he] could," and Wienner therefore concluded he did not need to speak with Sherry. (*Id.* at 125, ECF #32-1 at 33, Pg. ID 828.) The Court concludes

45

that Wienner's decision not to confer with Sherry or his counsel is not evidence that Wienner made his determination in bad faith.

For all of the reasons stated above, the Court concludes that Sherry has failed to satisfy his burden to show that Wienner's determination that Rockwell should not pursue the claims in the Demand Letter was made in bad faith.

## IV

In Count II of his Complaint, Sherry alleges that Defendants "breached their fiduciary dut[ies] by filing and seeking shareholder action on the basis of the materially false and misleading 2014 Proxy [Statement]." (Compl., ECF #1 at ¶84, Pg. ID 27.) Sherry maintains that this is "direct" claim brought on behalf of all of Rockwell's shareholders (*See id.*). Defendants have moved to dismiss this claim on the basis that, among other things, "it is actually a derivative claim," and that Sherry "lacks standing" to raise the claim. (Mot. at 32, ECF #15 at 44, Pg. ID 140.) Sherry contends that he does have standing. (*See* Sherry Resp. Br. at 13-18, ECF #17 at 22-27, Pg. ID 560-65.)

In order to determine whether this claim is direct or derivative and is otherwise viable, the Court needs a clear understanding of the relief sought in the claim. The Court does not have that essential understanding.

While Sherry has been clear that the claim does not seek money damages (*see* 5/27/16 Hearing Tr. at 48, ECF #25 at 48, Pg. ID 729), there is less clarity

with respect to non-monetary relief that he may be seeking. In his Complaint, Sherry requests that the Court enter "[a]n order requiring [Rockwell] to correct the 2014 Proxy [Statement] and provide shareholders an opportunity to revote on the Plan amendments." (Compl. at 29, ECF #1 at 29, Pg. ID 29.)  Sherry's counsel repeated this request for a revote at the initial May 27, 2016, hearing on the Motion. (*See* 5/27/16 Hearing Tr. at 48, ECF #25 at 48, Pg. ID 729) ("I think probably an appropriate remedy…would be [] an opportunity presented to shareholders that more explicitly presents to them the question of ratification"). But at the second hearing on the Motion on October 20, 2016, Sherry's counsel told the Court that he did not believe a revote was possible, and that Sherry instead wanted some kind of declaration that prohibited Rockwell from issuing misleading proxy statements in the future.

The Court directs Sherry to file a supplemental brief that (1) identifies *precisely* and *in detail* what relief he is seeking in count two of his Complaint, (2) explains how the relief sought renders the claim a direct one, (3) explains how the relief sought is available as a remedy for the alleged wrongdoing, and (4) explains how this Court may grant the requested relief consistent with Article III of the United States Constitution.  Sherry shall file this brief by not later than November 18, 2016.  Defendants may file a response brief by not later than December 9, 2016.  These briefs shall not exceed fifteen pages.

# V

For the reasons stated herein, **IT IS HEREBY ORDERED** that the Motion (ECF #15) is **GRANTED IN PART.**  Counts I, III, and IV of the Complaint are **DISMISSED**.  The parties shall file supplemental briefs with respect to Count II of the Complaint as set forth above.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  October 25, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 25, 2016, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113

48